221 So.2d 170 (1969)
NORTH DADE IMPORTED MOTORS, INC., Appellant,
v.
BRUNDAGE MOTORS, INC., Appellee.
No. J-475.
District Court of Appeal of Florida. First District.
March 18, 1969.
Rehearing Denied April 30, 1969.
*171 Boyd, Jenerette & Leemis, Jacksonville, for appellant.
Kent, Durden & Kent, Jacksonville, for appellee.
RAWLS, Judge.
We are again confronted with reviewing the discretion of a trial judge in granting a new trial. Appellee-Plaintiff Brundage Motors, Inc. instituted this action against Appellant-Defendant North Dade Imported Motors, Inc. for the recovery of $14,109.92, which sum North Dade admitted it owed. Concurrent with admitting its indebtedness to Brundage, North Dade counterclaimed for compensatory and exemplary damages in the sum of $500,000.00. This action was tried upon the counterclaim resulting in a jury verdict of $214,109.92 in favor of North Dade. After deducting the $14,109.92 due to Brundage, North Dade found itself the recipient of a $200,000.00 net verdict, which was set aside by the trial judge. North Dade now appeals the trial judge's order and contends he abused his discretion in setting aside the verdict and granting a new trial.
North Dade's nine-page counterclaim was phrased in three counts: Count 1 alleged breach of an express agreement by Brundage with North Dade by (a) failing and refusing to deliver Volkswagens in accordance with an allocation system; (b) discriminating against North Dade in withdrawing its name from cooperative advertising while making such available to its competitors; (c) failing to provide sales and/or management training to its personnel while making same available for other Volkswagen dealers in the area; (d) failing and refusing to deliver parts and special tools to it; and (e) withholding delivery of approximately sixty vehicles it had validly ordered until after its business was sold. Count 2 alleged a tortuous unlawful interference with the business relations by maliciously: (b) revealing confidential information about its business to prospective purchasers: (d) destroying the bargaining power of the defendant in connection with the sale of its business, but instead promoting the sale to others of plaintiff's choosing at financial loss to it. Claims under (a), (c) and (e) were removed from consideration of the *172 jury. Count 3 alleged breach of oral contract in that the plaintiff induced the defendant to purchase land at a cost of $61,000.00 and to have erected thereon a building worth $200,000.00 upon representations, relied upon by defendant, that if it did so, the plaintiff would permit the defendant to retain its dealership for a period of ten years in order to allow it to recover its investment and that the plaintiff breached that agreement to the damage of defendant. Exemplary as well as compensatory damages were claimed for Counts 2 and 3.
Material portions of the contested order granting a new trial are as follows:
"* * * it is the opinion of the Court that the jury did not follow the evidence or the law and that a new trial should be granted on defendant's counterclaim. As examples, the Court will point out that 86 exhibits totaling far more than 100 pages were received in evidence, the great majority of the exhibits being neither explained nor read to the jury by witnesses or attorneys; the jury also heard two full days of testimony: After being instructed on the law, the jury was `out' twenty minutes and returned a verdict in favor of counterclaimant in the sum of $214,109.92. Further, the testimony shows that plaintiff's distributorship was terminated April 1, 1966 (approximately nine months after it terminated defendant's dealership) and, therefore, could not have extended defendant's dealership contract into the year 1972 as alleged and claimed by defendant. * * *
"ADJUDGED that plaintiff's Motion and amended Motion for a Judgment non obstante veredicto shall be and the same are hereby denied. * * *
"ADJUDGED that the plaintiff's Motion for remititur shall be and the same is hereby denied. * * *
"ADJUDGED that plaintiff's Motion for a new trial of defendant's counterclaim shall be and the same is hereby granted on grounds (1) and (2) of said Motion for New Trial * * * and the Judgment entered thereon be and the same are hereby severally vacated and set aside and a new trial is hereby granted on defendant's counterclaim."
The grounds stated therein were:
(1) The verdict is contrary to the law and the evidence.
(2) The verdict is contrary to the manifest weight of the evidence.
Due to the grounds recited by the trial judge, it is necessary to delve into the facts and exhibits contained in this extensive record.
The facts are: North Dade Imported Motors, Inc., the stock of which was owned or controlled by William H. Chatlos, became an authorized Volkswagen dealer in the Miami area in 1956. Brundage Motors, Inc. was distributor for Volkswagen products in Florida and other areas. Prior to granting Chatlos (North Dade) a franchise for the year 1960, Brundage required that he construct new facilities. Chatlos made arrangements to purchase raw ground for the new facilities; however, by the spring of 1961, he decided that since North Dade would be unable to meet Brundage's "future requirements, as far as capital is concerned * * *", he should sell the dealership. Brundage, in a letter signed by Eric R. Sundstrom, its executive vice president, advised Chatlos that "In view of the present condition of your dealership, we must stress to you the importance of continuing every effort in the sale of the products you already have in inventory so that the dealership can maintain its obligations and show the profit that a prospective buyer would certainly be interested in." It was against this background that the present principals became involved in North Dade.
In late April or early May, 1961, H. Perry Gainey, on behalf of himself, Carl Schweers and L.E. Willis, Jr., telephoned Brundage Motors to discuss the possibility *173 of establishing a Volkswagen dealership in St. Petersburg. He was put in touch with Bob McDowell of Brundage who informed him that a dealership was for sale in the Miami area. Around the middle of May, Gainey and Willis journeyed to Jacksonville where they met with McDowell and other Brundage officials. Subsequently, McDowell, Brighton (a Brundage official), Gainey, and Willis flew from Jacksonville to Miami in Brundage's airplane to meet Chatlos and examine North Dade's operation. After several meetings with Brundage officials and Chatlos, an agreement was reached for Gainey, Willis and Schweers to purchase all of North Dade's stock. Brundage's chief concern was that adequate capital be provided by the Gainey group to assure construction of a new physical plant and working capital in the sum of $75,000.00. During these meetings, Brundage advised Gainey and Willis that since it only had a one-year contract as a distributor, it could only give to them a year's contract. Gainey and Willis "thought it was an awful undertaking to build new facilities for the amount of money they were talking about spending, and in talking to banks, they wouldn't lend no money under the circumstances to build facilities." Brundage assured Gainey and Willis as long as they performed and attended to their customers and sales, they would have the dealership as long as Brundage was a distributor. On June 2, 1961, the Gainey group purchased North Dade. On this date a written memorandum signed by Willis and Gainey addressed to Brundage stated in part: "* * * Mr. Gainey and Mr. Willis both stated that they would proceed directly to work toward establishment of a building and site satisfactory to serve the area in which the dealership is located. This is recognized by all of the parties concerned as being a very important part of the program for the future development of this dealership." (Emphasis supplied.)
North Dade, under its new ownership, employed an architect and negotiated with Brundage regarding the design of a new building. Financing could not be procured from normal channels, banks or insurance companies, because the building was designed for a single purpose, that being principally as a Volkswagen facility. North Dade then procured financing from a group of investors who leased the building to it for a term of ten years, including a provision that upon expiration date of the lease, the building became the property of North Dade.
Brundage played a major role in the design, size and construction of the special purpose building. Numerous exhibits reflect the injection of Brundage's requirements as to the construction of the building, parts bins, fixtures and change orders during construction. Willis testified, "After hiring an architect, I finally told, I believe, Mr. Esser (Industrial Designer) who was with Brundage at that time, they were on me all of the time to do something about this building, and I finally told them to leave me alone; I wanted to sell automobiles, that I would only talk to the architect. After that, they did quite a bit of correspondence with him on changes and such as this. Toward the end, it looked like the building was going to be prohibitive to build. After what we wanted and they wanted, it looked like we wouldn't be able to build the building at all costwise, but we went ahead anyway." The cost of the building was approximately $162,000.00 with an additional $13,000.00 worth of change orders. North Dade moved into the new facility October 1, 1962.
Business was good for the new owners of North Dade. Volkswagen passenger units were pre-sold with a per car profit of $286.84. Their major problem was in procuring passenger units to sell. On September 27, 1961, North Dade's sedan unit allocation was increased from 28 to 32 per month, with a further increase of 40 sedan units upon moving into their new facilities. The latter allocation was continued in the year 1963 with a commendation from the general sales manager of Brundage "* * for making 1962 a Banner Sales Year."
*174 Smooth sailing continued for North Dade until around October 23, 1963, when due to internal problems Willis was placed on a leave of absence as general manager. Gainey and Schweers met with Brundage's general manager, Sundstrom, and discussed with him Willis's leave of absence and the procurement of a new manager. Sundstrom then said that it was all right to discharge Willis, and he would send Mr. McKigney by to assist in drafting a letter to Brundage for approval of change in management of North Dade. The letter, dated November 1, 1963, requested approval of a change in president and general manager from Willis to Schweers and deletion of any interest of Willis in beneficial ownership of North Dade. In a letter dated November 22, 1963, signed by Sundstrom as vice president and general manager. Brundage denied the request in change of management and advised North Dade that it did not intend to renew its dealer agreement for 1964, but would assist in selling the dealership. North Dade entreated Brundage to reverse its position, but as of January 1, 1964, orders were issued by Brundage to cease shipping parts and vehicles to North Dade and to eliminate advertising reflecting North Dade as an authorized Volkswagen dealer. In addition, a Brundage employee advised employees of North Dade that Gainey and Schweers were going to be forced to sell the business, and if they did not sell, Brundage would open another dealership at that location if it had to go across the street. So, as of the first of January, North Dade was for practical purposes out of the Volkswagen business.
North Dade's only contractual violation cited by Brundage was its change in management and violation of the percentage of beneficial ownership. The beneficial ownership of the stock was in Willis, Schweers and Gainey, but Willis's percentage of ownership was not the same as represented to Brundage. The legal title to Gainey's and Schweers' stock was vested in corporations dominated by them respectively. In his testimony Sundstrom made a point of the fact that ownership was not vested in the individuals involved; however, the agreement refers to beneficial interest.
Further negotiations were had between Brundage and North Dade. Brundage offered a ninety-day extension provided it mutually agreed to cancel the Dealer Agreement, which was refused by North Dade. The business continued to be operated by North Dade, with Brundage furnishing the vehicles on the basis of the 1963 allocation, although North Dade was entitled to a substantial increase if its agreement had been renewed. During the first part of 1964, North Dade submitted several financially qualified potential purchasers to Brundage, which refused to approve any of them. Two of these prospective purchasers had come to an agreement with North Dade subject to the approval of Brundage. One was approved by Brundage for another area although it refused to consider this same purchaser as to the North Dade facility.
Of significance is Sundstrom's testimony that during the period from January 1964 through July 31, 1964, North Dade's service department was outstanding and that sales were good; that from the time Brundage advised North Dade on November 22, 1963, its franchise would not be renewed, its operation was not contrary to good work or detrimental to the spirit of their agreement. Sundstrom stated: "The service department was well operated. Their sales were good, as far as they had been doing. I did not criticize the operation." His only criticism was with reference to "the difficult area we talked about"  this being North Dade's delay in the sale of its business.
On May 1, 1964, Sundstrom advised North Dade that a particular prospect submitted by North Dade was unacceptable and it had found no qualified purchasers to submit to it. This letter also stated that Brundage had done its best to supply North Dade with the normal amount of vehicles so it would realize the necessary profits. Gainey and Schweers in a letter dated May *175 31, 1964, offered to sell to Brundage all of the capital stock in North Dade. This offer was rejected by a six-page letter dated June 11, 1964, which recited inter alia: North Dade's dealership had expired December 31, 1963; Brundage was willing to find a purchaser for its assets upon detailed terms outlined by it; and it was not obligated to repurchase anything from North Dade except certain trademark signs, literature, and customer lists. Meanwhile, at Brundage's request, Volkswagen of America had on May 20, 1964, approved one Bob Houston, as a purchaser of North Dade. Brundage would approve only one prospective purchaser at a time and would not submit to Volkswagen of America any names while an approved prospect was pending. Brundage, without North Dade's consent or knowledge that it was negotiating with Houston, had furnished him with North Dade's financial statements.
During the last week of May 1964, a Brundage representative brought Bob Houston to North Dade's office for the purpose of negotiating a sale of the business to him. No negotiations were had that day but were begun in subsequent meetings. On June 26, 1964, Brundage advised North Dade by certified mail that its "month to month" dealer-distributor relationship would be terminated as of July 31, 1964. In July 1964 Brundage again furnished Houston with North Dade's latest financial statement. Negotiations continued between Houston and North Dade, and finally in August 1964, with Sundstrom and other Brundage officials participating, a sale of the business to Houston was consummated on the terms dictated by Brundage.
We are not so naive as to think that this opinion will forever settle the question of the discretion a trial judge may exercise in granting a new trial. The Supreme Court's opinion in Cloud v. Fallis,[1] authored by Mr. Justice Thomas, attempted to accomplish this feat; however, as reflected in the numerous subsequent appellate decisions upon the subject, the question has not been forever resolved. Language set out in Cloud v. Fallis, supra, could be construed to support an argument that once a trial judge finds the verdict is contrary to the manifest weight of the evidence, an appellate court is without authority to upset such finding.[2] It is well settled that the burden is on the appellant to clearly demonstrate error.[3] Moreover, we said in this Court's opinion in Cross v. Atlantic Coast Line Railroad Company,[4] "The trial court had an opportunity to view the witnesses and their demeanor on the witness stand and to observe the expressions of the jurors when listening to testimony * * *"[5] and may in exercising its broad discretion grant a new trial.
*176 An order granting a new trial is clothed with a strong presumption of correctness,[6] and a much stronger showing is required to reverse an order allowing a new trial than to reverse one denying it.[7] So, we are not unmindful of the fact that the Supreme Court has eliminated the "substantial competent evidence" rule, and the applicable rule is that of "broad discretion" in reviewing a trial court's order granting a new trial.[8] Likewise, a new trial should not be granted unless it is reasonably clear that substantial rights have been violated to the extent that a fair trial was not had.[9] "Judicial discretion" is not an unabridged power by which a judge may set at naught the rights of the parties to a cause and define them in accordance with his current opinion.[10] A trial judge's statement that the verdict is contrary to the manifest weight of the evidence is not chiseled in marble immune to erasure; it must be weighed in the light of the disclosures of the record.[11] It is an abuse of discretion to grant a new trial where the verdict finds ample support in the record, no illegal evidence is shown to have gone to the jury, and all that is to be accomplished is to have another jury try the cause.[12]
It is with the foregoing principles of law in mind tha we review the two grounds recited by the trial judge in his order granting a new trial. We first comment on the trial judge's finding: The verdict is contrary to the law and the evidence. It is noted that at the outset, Brundage's motion to dismiss the instant counterclaim was denied. At the conclusion of North Dade's case, Brundage's motion for directed verdict was denied. Brundage again moved for a directed verdict upon all evidence being adduced, which was denied. By post-trial motion, Brundage sought a judgment non obstante veredicto and it was denied. No grievance as to instructions by the trial judge was lodged, nor has Brundage filed any cross assignments of error on this appeal as to the conduct of the trial.
The record does not support the observation of the trial judge in his order granting a new trial "* * * that 86 exhibits totaling far more than 100 pages were received in evidence, the great majority of the exhibits being neither explained nor read to the jury by witnesses or attorneys; * * *" The exhibits as a whole were either read, exhibited or explained to the jury during the course of the trial and those which were not touched upon in this manner were primarily corroborative.
The remaining example cited in the preface of the trial judge's order granting a new trial was: "Further, the testimony shows that plaintiff's distributorship was terminated April 1, 1966 [the date shown in the record was March 31, 1965] (approximately nine months after it terminated defendant's dealership) and, therefore, could not have extended defendant's dealership contract into the year 1972 as alleged and claimed by defendant. Other examples appear in the record." As to this portion, it is noted that all of the evidentiary rulings of the trial judge on the question of assessment of damages to the year 1972 were in favor of Brundage. It is also noted that Sundstrom testified that all of Brundage's dealers were granted new franchises for 1965 despite the termination of the distributorship. *177 The trial judge's rulings in denying motions for directed verdicts, judgment non obstante veredicto, and remittitur of damages do not comport with this example as a reason for granting a new trial. There is nothing in this record to suggest that the jury assessed damages to the year 1972 in making up in whole or in part its general verdict. This is especially true in view of the rulings of the trial judge precluding the introduction of evidence by North Dade as to such damages.
A meticulous examination of the record by this Court fails to disclose any basis for the conclusion by the trial judge that the jury did not follow the law as instructed. A jury verdict arrived at in a short period of time, standing alone, is not sufficient evidence to establish the fact that the jury failed to fulfill its function.[13]
Manifest weight of the evidence poses the major question. The extensive recitation of facts set out above presents to the reader some of the highlight evidentiary matters that the jury was at liberty to believe. Suffice it to say that the actions of Brundage were a pattern of representations, inducements and actions that convinced the jury it had severely damaged North Dade. Disputed questions of fact are matters to be resolved by the jury. Obviously, the jury believed that Brundage did willfully breach its contract with North Dade, and the evidence supports such a finding. The same observation can be made as to interfering with North Dade's business relations and breach of promise to renew the franchise. It is our conclusion that this extensive record would support a finding that the manifest weight of the evidence is in favor of North Dade. The record is without foundation to support the order for a new trial.
Both parties argue at length as to the amount of damages. As stated at the outset, the trial judge denied Brundage's motion for a remittitur; he did not find that the damages were excessive, nor make any comment concerning same in his order granting a new trial save the observation that the jury was "out" twenty minutes; thus, this question is not material to this review. However, by way of obiter dictum, this Court finds ample evidence as to compensatory and punitive damages in support of the jury's verdict.
Franchise agreements are a way of life in this era of business. The written terms of such agreements are enforceable. By like token, as recognized by the trial judge in denying Brundage's several motions for a directed verdict, the inducement and performance of such agreements must be evaluated in interpreting the written instrument. The evidence here reflects that Brundage cracked the whip of economic power in its dealings with North Dade. Brundage decided where North Dade was to do business, who was to manage its business, what type and design building it was to construct, how many vehicles it had to sell, what parts it had to stock, the type and manner of keeping its books, and who could own its stock. All of this may well be within the range of an agreement to be reached by independent sui juris businessmen. However, when it arbitrarily decided to put North Dade out of business, placed it in such an economic position that it was forced to sell to only a person of Brundage's choosing upon the terms and conditions dictated by Brundage, the agreement between the parties, in light of all the circumstances surrounding its execution and performance became a subject to be resolved by a jury within the instructions of the law given by a court of competent jurisdiction. And this is what the jury did. Apparently, appellate courts have not been judicially endowed with a conscience; if we are so blessed, our conscience has been shocked by the way Brundage has taken its sledge of franchise agreement and driven *178 the wedge of economic power through the corporate body of North Dade.
Reversed and remanded with directions to enter final judgment upon the jury verdict in favor of North Dade.
WIGGINTON, C.J., and CARROLL, DONALD K., J., concur.
NOTES
[1] Cloud v. Fallis, 110 So.2d 669 (Fla. 1959).
[2] Id. at p. 673:

"When the judge, who must be presumed to have drawn on his talents, his knowledge and his experience to keep the search for the truth in a proper channel, concludes that the verdict is against the manifest weight of the evidence, it is his duty to grant a new trial, and he should always do that if the jury has been deceived as to the force and credibility of the evidence or has been influenced by considerations outside the record, * * *
* * * * * * *
"The burden to make error clearly appear is on the appellant. Although when such an attempt is made the record must be examined by the appellate court, the assailant cannot content himself simply to submit the record and expect the order to be upset if the reviewing body finds, in cold type without benefit of any of the circumstances known to the trial judge, and never to be known to the appellate court, that there appears to be some `substantial competent evidence' supporting the verdict."
[3] Id. at p. 673; and Danek v. Hoffman, 189 So.2d 893 (Fla.App.2d 1966).
[4] Cross v. Atlantic Coast Line Railroad Company, 190 So.2d 21 (Fla.App.1st 1966).
[5] This observation was apparently made in conjunction with the finding of the trial judge that the jury was motivated by passion, prejudice or bias.
[6] Grant v. Williams, 190 So.2d 23 (Fla. App.2d 1966).
[7] Tye v. Ruark, 179 So.2d 612 (Fla.App.2d 1965).
[8] Spearman Distributing Company v. Boyette, 205 So.2d 690 (Fla.App.1st 1968).
[9] Warner v. Goding, 91 Fla. 260, 107 So. 406 (1926).
[10] Florida Power Corporation v. Smith, 202 So.2d 872 (Fla.App.2d 1967).
[11] Russo v. Clark, 147 So.2d 1 (Fla. 1962).
[12] McAllister Hotel, Inc. v. Porte, 123 So.2d 339 (Fla. 1960); Cobb v. Brew, 155 So.2d 814 (Fla.App.1st 1963).
[13] Park v. Belford Trucking Co., 165 So.2d 819 (Fla.App.3d 1964).