269 So.2d 714 (1972)
ASHLAND OIL, INC., and Cobia Boats, Inc., Appellants,
v.
Rod PICKARD et al., Appellees.
MODERN FIBER GLASS, INC., and Harold L. Slama, Appellants,
v.
Rod PICKARD et al., Appellees.
Nos. 72-102, 72-103.
District Court of Appeal of Florida, Third District.
November 28, 1972.
Rehearing Denied December 21, 1972.
*716 Bedell, Bedell, Dittmar, Smith & Zehmer, Jacksonville, for appellants.
Preddy, Haddad, Kutner & Hardy, Podhurst, Orseck & Parks, Miami, for appellees.
Before PEARSON, HENDRY and HAVERFIELD, JJ.
PER CURIAM.
Two appeals have been consolidated. The primary issue in appeal No. 72-102 concerns the applicability of the statute of frauds provisions of § 725.01, Fla. Stat., F.S.A. requiring a written memorandum signed by the party to be charged for an agreement not to be performed within one year, and § 672.201 Fla. Stat., F.S.A., requiring a written memorandum for the sale of goods for a price of $500.00 or more. The primary issue in appeal No. 72-103 concerns the propriety of granting a new trial.
In appeal No. 72-102, defendants, Ashland Oil, Inc. and its wholly owned subsidiary, Cobia Boats, Inc., appeal from a final judgment entered upon jury verdicts which awarded compensatory and punitive damages to plaintiffs Captain Rod Pickard and his wholly owned companies Marine Dynamics Corporation and Transmarine Corporation in an action for deceit and breach of contract. In appeal No. 72-103, *717 defendants Harold L. Slama and Modern Fiber Glass, Inc., seek review of a post-judgment order in the same action which set aside the jury verdict in their favor on the merits and the punitive damages award against them and then ordered a new trial on all issues as to these two defendants. We affirm the final judgment and post-judgment order appealed in all respects.
Plaintiff Captain Rod Pickard at all relevant times was president and sole owner of the two corporate plaintiffs. He acquired in 1967, Marine Dynamics Corporation to construct and sell large fiberglass vessels. Pickard incorporated Transmarine Corporation to construct and sell commercial fishing vessels, originally of wood, and at times material to this case, of fiberglass.
Defendant Ashland Oil, Inc., is a diversified national company and it wholly owns Cobia Boats, Inc. (formerly Southern Fiberglass, Inc.). In turn, Cobia Boats, Inc., at all times material, wholly owned Modern Fiber Glass, Inc. (formerly a privately held company known as Newport Trawlers, Inc.).
Harold L. Slama was, at various times, both president and chairman of the board of Southern Fiberglass, Inc., i.e., Cobia Boats, Inc., and president of Modern Fiber Glass, Inc.
Plaintiffs claim that from the outset of negotiations defendants formulated a scheme to lead Captain Pickard to rely on oral and written representations that he would have the first right to outfit and sell large fiberglass hulls manufactured by Southern Fiberglass, Inc., so that defendants could utilize his expertise in outfitting these hulls, while at the same time defendants secretly prepared to outfit the vessels in Tampa, themselves. An important aspect of the scheme came to be that the vessel "Bonnie," also known as hull No. 3, would be taken from plaintiffs' shipyard immediately before defendants inaugurated a saturation advertising compaign in connection with a commercial fishing exposition.
An amended complaint was framed in three counts for breach of contract and for fraud in the inducement and the trial proceeded upon those allegations and ones concerning the taking of the fiberglass shrimp trawler "Bonnie". Throughout, Slama was alleged to have acted in an individual and agency capacity.
Count I alleged the following matters: On August 23, 1968, Slama entered into an oral agreement with the three plaintiffs, which provided that Cobia and Ashland would sell all of their production of large fiberglass hulls to Marine Dynamics according to a certain cost formula. It averred that Slama's handwritten agreement dated August 23, 1968, and signed by Slama and Pickard, provided that Pickard and Transmarine would first outfit hull No. 3 for $70,000.00 and then Pickard and Transmarine would use their best efforts to sell it for $85,000.00. Material portions of that handwritten agreement attached to the amended complaint are as follows:
"August 23, 1968
"For the purpose of fitting out No. 3. Fiberglass 73 Shrimper Trawler hull as a new prototype with new ideas in pilot house, rigging, winch, etc. and to show at the Boston Fish Expo in Oct. of 1968 the following agreement has been made between Harold L. Slama of Southern Fiber Glass Products Inc. as owner of the vessel, and Rod Pickard of
Marine Dynamics as contractor.
Transmarine Corp

[A6976]
"* * *
"9. Every effort will be made to complete boat for Boston Fish Expo Oct. 1968.
"* * *
"10. This agreement is being made with the intention that Marine Dyamics (sic) *718 will become sole agent for these Fiberglass shrimp trawlers.
"* * *" [Corrections in original.]
Count I also alleged that on December 24, 1968, Slama hand delivered to Pickard an unsigned letter confirming the agreement then existing between the parties and that defendants, knowingly and with a fraudulent intent, falsely represented to plaintiffs that defendants would supply all of Cobia's production of commercial fiberglass hulls. Slama represented that the typewritten and unsigned agreement of December 24, 1968, would remain in effect, thereby inducing Pickard and Marine Dynamics to sell for $65,000.00 certain plans, specifications and a "plug" for a seventy-three foot fiberglass shrimp trawler, which had been designed by a prominent marine architecture firm, Gibbs & Cox. Slama made false representations to induce Pickard to sign the December 30, 1968 document, and in reliance thereupon, Pickard sold these assets. Thereafter representations were made that the prior agreements, rather than the signed December 30, 1968 document, were in force. Plaintiffs undertook an extensive advertising campaign and committed their resources to outfit hull No. 3. As a proximate result of defendants' actions orders were cancelled and the business was abandoned. Specific compensatory and punitive damages were sought.
In Count II the preceding matters were realleged and plaintiffs further stated that in March, 1969, Pickard and Transmarine advised defendants that they desired to purchase hull No. 3. Cobia and Ashland confirmed the agreement to sell by a letter from Morrison M. Bump, vice-president of Ashland Chemical Company, a division of Ashland Oil, attached as an exhibit to the complaint. Pickard and Transmarine secured financing and allegedly performed all conditions precedent and set a closing for May 12, 1969, in Dade County, Florida. Nevertheless, defendants towed away the vessel on May 12, 1969, even after reassuring Pickard and Transmarine that the closing would take place. Pickard and Transmarine had previously informed defendants that the reason for their purchasing the vessel was to use it as a prototype and to salvage the additional investment they made in the vessel. As a proximate result plaintiffs lost their additional investment of $52,000.00.
Count III reaverred these matters and stated that defendants with the intent to defraud plaintiffs falsely represented that the vessel would be sold to them, even though defendants actually had no intention of selling it. Based upon these knowingly made fraudulent misrepresentations, plaintiffs were induced to invest additional money and effort to develop and outfit the vessel. As a proximate result thereof the initial investment of $52,000.00 was lost. Plaintiffs sought compensatory damages in that amount and specified punitive damages.
Two motions to amend the pleadings were made. Plaintiffs' attempt at pretrial to add a cause of action for unfair trade practices was denied by the trial court. Near the conclusion of the trial, the court granted plaintiffs' motion to amend the complaint to reflect breaches of oral and written agreements, to correct typographical errors, and to amend the ad damnum clauses to read "amounts within the jurisdiction of the court."
Plaintiffs in support of their allegations adduced evidence which showed among other things that defendants initiated a plan to deceive the plaintiffs, obtain their resources and then extricate themselves from an association with Pickard by using any means at their disposal,[1] particularly if the *719 venture were to turn out as profitably as they had thought it might.[2] Defendants were dealing with the plaintiffs with "tongue in cheek", as documented by vice president Bump in his memorandum of March 5, 1969.[3]
The jury returned these verdicts:
"We, the Jury, find for the Plaintiffs on the issue of compensatory damages and against Defendants, ASHLAND OIL, INC., and COBIA BOATS, INC., and for Defendants, MODERN FIBER GLASS, INC., and HAROLD L. SLAMA, and assess such damages in the amount of $250,000.
"So say we all.
 "/s/ JACK L. ARNOLD 
 Foreman
Dated: December 4, 1971."
and
"We, the Jury, find for the Plaintiffs on the issue of punitive damages and against Defendants, MODERN FIBER GLASS, INC., ASHLAND OIL, INC., COBIA BOATS, INC., HAROLD L. SLAMA, and assess such damages in the respective amounts as follows:

 "Against MODERN FIBER
 GLASS, INC. $ 25,000.
 "Against ASHLAND OIL,
 INC. $ 1,400,000.
 "Against COBIA BOATS,
 INC. $ 100,000.
 "Against HAROLD L.
 SLAMA $ 25,000.

"So say we all.
 "/s/ JACK L. ARNOLD 
 Foreman
 "Dated: December 4, 1971."
Defendants Ashland and Cobia present these points on appeal, which we have paraphrased:
I. Trial court erred in not entering judgment for defendants.
A. & D. Plaintiffs never tendered payment for any hull and defendants had no obligation to deliver.
B. Statute of frauds bars action based on the unsigned December 24, 1968 writing or claimed oral agreement to same effect.
C. No action in contract or fraud arose under the handwritten August 23, 1968 agreement.
E. Cobia properly cancelled the December 30, 1968 agreement preventing liability arising thereunder.
*720 II. Trial court erred in receiving evidence as to lost profits and instructing the jury regarding them.
III. There was no competent evidence to support an award of punitive damages, and the award was excessive.
IV. The trial court erred in: admitting plaintiffs' incompetent evidence, excluding defendants' relevant evidence, and in charging the jury.
V. Ashland and Cobia are entitled to a judgment as a matter of law because the jury exonerated defendants Modern Fiber Glass and Slama on the merits.
Defendants Modern Fiber Glass and Slama contend that the trial court erred in setting aside the verdict and judgment for them on the merits and in ordering a new trial as to them on all issues.
We have also paraphrased plaintiffs' contentions:
I. Jury questions exist on all issues; Defendants Ashland and Cobia not entitled to judgments as a matter of law.
A., C. & D. Fraud in inception and breach of overall contract shown. No tender of payments for hull No. 3 required.
B. & E. Statute of frauds inapplicable; telegram effective as signed memorandum of agreements.
II. Jury question existed on damages for lost profits; no error in instructions or compensatory damages.
III. Jury question existed on punitive damages; they were not excessive.
IV. No error in rulings on evidence or in instructions to jury.
V. Appellants Ashland and Cobia are not entitled to judgment because of jury finding in favor of Modern Fiber Glass and Slama on compensatory damages.
VI. No error in order awarding new trial against Modern Fiber Glass and Slama in Appeal No. 72-103.
The first issue we shall discuss is whether statutes of frauds, §§ 672.201 and 725.01, may be avoided by a suit for fraud in the inducement. We hold that they cannot.
To begin with, Florida recognizes deceit as an independent tort, as did the common law, and Florida also permits an action for fraud in inducement for which compensatory and punitive damages are recoverable. While the following cases may differ in the representations made and the contracts involved, nevertheless substantial judgments for defrauded plaintiffs may be recovered in similar actions.[4]
Defendants rely upon those cases which contain statements that representations as to promises or future events do not in law constitute fraud,[5] such as in Harrington v. Rutherford, 38 Fla. 321, 21 So. 283, 285:
"As a general rule, fraud cannot be predicated on a mere promise not performed. As stated in one case: `To be available, there must be a false assertion in regard to some existing matter by which a party is induced to part with his money or his property. In morals, the failure to perform a promise may be without excuse or justification; but, in law, false representations to authorize *721 the rescission of a contract must be made in regard to existing facts.' Perkins v. Lougee, 6 Neb. 220. The authorities establish the rule that, ordinarily, a promise to do something in the future, though made by one party as a representation to induce another to enter into a contract, will not amount to a fraud in a legal sense, though the promise subsequently and without excuse be broken and unfulfilled. [Citations omitted]."
However, the court there did not reach the question of whether the case would be governed by the Harrington rule. Later decisions, such as Beach v. Williamson, 78 Fla. 611, 83 So. 860, 9 A.L.R. 1438, did recognize exceptions to that rule.
We express the view that an action setting forth the elements of common law deceit, such as for fraud in the inducement, may be based on oral and written representations and these representations may be in the form of contractual promises or statements of present intention. See: cases cited Note 4, supra; General Corporation v. General Motors Corporation, 184 F. Supp. 231, 234 (U.S.D.C.Minn., 1960), and "Anno., Promises and statements as to future events as fraud," 51 A.L.R. 46 (1927). Therefore, the elements of the tort of intentional misrepresentation were made out by the allegations and proof in the instant case.
The authorities are in conflict as to whether a suit in tort for fraudulent promises renders the statute of frauds inapplicable. See: General Corporation v. General Motors Corporation, supra; "Comment Note, Action for fraud or deceit predicated upon oral contract within the Statute of Frauds or the transaction of which the oral contract was a part," 104 A.L.R. 1420 (1936). The Florida rule is that the statute of frauds may not be avoided by a suit for fraud based on oral representations; Canell v. Arcola Housing Corp., Fla. 1953, 65 So.2d 849, 850:
"... [T]he complaint contains a greater infirmity which required its dismissal. The complaint shows on its face that the plaintiffs' claims, whatever they may be, are predicated upon the alleged breach of an oral promise concerning an easement in land  the ownership of which is not alleged nor the location or description given."
Elsberry v. Sexton, 61 Fla. 162, 54 So. 592; Williams v. Faile, Fla.App. 1960, 118 So.2d 599; Neveils v. Thagard, Fla.App. 1962, 145 So.2d 495, 497.
However, in the case sub judice, the requirements of § 725.01 (contract for more than one year) and § 672.201 (sale of goods for a price of $500.00 or more) have been satisfied, first by memoranda signed by the party against whom relief is sought, and second by part performance of the agreement[6] by the parties.
The handwritten contract of August 23, 1968, signed by both parties, serves as a signed contract and memorandum. Some pertinent provisions were quoted above, and contain the essential terms of their agreement.
The defendants claim that the December 24, 1968, document was not signed by them. However, its provisions were *722 prepared by their authorized agent, Mr. Slama, and was typed by Mr. William Penny (part-time accountant and secretary for Pickard) at Mr. Slama's request from his handwritten notes. It was typed as if on a letterhead of Southern Fiberglass and contained a signature line with the typed words, "Harold L. Slama, President." § 671.201(39), Fla. Stat., F.S.A. provides that: "`Signed' includes any symbol executed or adopted by a party with present intention to authenticate a writing." The evidence is apparently uncontested, however, that on December 24, 1968, the parties "intended" a written signature of that document; but this is the predicate for plaintiffs' next argument.
The telegram of December 23, 1969, sent and signed[7] by defendants referred to all written and verbal agreements:
"Capt Rod Picard, (sic.) DLY 75
730 Buttonwood Lane Bay Point Miami Flo
"Cobia Boats Inc formerly Southern Fibrelas (sic.) Inc hereby cancels that letter agreement dated 12/3/68 (sic. 12/23/68) relating to the manufacture of 76 foot by 22 foot shrimp trawler and all other agreements, oral or writte, (sic.) that may be in existence between you and Cobai (sic.)
"Cobia Boats Inc Southern Fibreglas (sic.) Inc"
This telegram constitutes a signed memorandum, and recognizes the unsigned written agreement of December 24, 1969. In Heffernan v. Keith, Fla.App. 1961, 127 So.2d 903, 904 the court concluded that a telegram referring to a certain proposed contract for the sale of land, in connection with the deposit receipt agreement and the oral evidence of the broker to whom it was directed, constituted a sufficient signed memorandum. Meek v. Briggs, 80 Fla. 487, 86 So. 271, which affirmed an order sustaining a demurrer to the complaint, noted that under the doctrine of integration a telegram may constitute a sufficient signed memorandum.
We find no merit in defendants' arguments regarding the parol evidence rule. That rule applies primarily where the controversy is of a contractual nature, but it has no application where the action is in tort for fraudulently inducing a party to enter into the writing.[8]
Settled law requires the trial court to fully and fairly instruct the jury on the issues in the cause. Rule 1.470(b), R.C.P., 30 F.S.A. requires the filing of written requested instructions and a charge conference. However, the harmless error doctrine is applicable to jury instructions. See: City of Hialeah v. Robinson, Fla.App. 1964, 163 So.2d 523; § 59.041, Fla. Stat., F.S.A.
In the instant case the trial court correctly refused to charge the jury on certain written requested jury instructions submitted by defendants. These requested instructions did not fully and fairly cover the issues and were too argumentative, see Florida East Coast Railway Co. v. McKinney, Fla.App. 1969, 227 So.2d 99, 104-105; considered together they virtually requested a directed verdict. See: Jayess Investments Limited v. Barbee Foods, Inc., Fla.App. 1963, 155 So.2d 853.
With respect to the more substantial claim that the charges to the jury were incomplete, we express the view that in their totality the actual charges given impartially addressed the salient issues of the cause. See: Stiles v. Calvetto, Fla.App. 1962, 137 So.2d 17; Southeastern General *723 Corporation v. Gorff, Fla.App. 1966, 186 So.2d 273; see also: Redwing Carriers, Inc. v. Urton, Fla. 1968, 207 So.2d 273.
The appellants contend that the compensatory damages for lost profits were based only upon speculative evidence, particularly where plaintiffs conducted a new business. We reject these claims, but for clarity begin the discussion of this issue with a point about election of remedies, which was not discussed by the parties, in light of the different measure of damages recoverable in actions for tort and for breach of contract.
In tort actions, the measure of damages seeks to restore the victim to the position he would be in had the wrong not been committed. In actions for breach of contract, the aim is not the mere restoration to a former position as in tort, but is the awarding of a sum which is equivalent to the performance of the bargain; the attempt is to place the plaintiff in the position he would be in if the contract had been fulfilled. McCormick, Damages, § 317, pp. 560-561 (1935).
In the case sub judice, plaintiffs recovered out-of-pocket expenses, such as $86,000 net for setting up the boat yard for virtually assembly line production (the amount is largely uncontested here) plus loss of profits on their sales. This would ordinarily be an impermissible double recovery. However, such an award is permissible where plaintiffs pursue an action both for deceit and breach of contract:
"... [O]ne who has been fraudulently induced into a contract may elect to stand by that contract and sue for damages for the fraud. When this happens and the defrauding party also refuses to perform the contract as it stands, he commits a second wrong, and a separate and distinct cause of action arises for the breach of contract. The same basic transaction gives rise to distinct and independent causes of action which may be consecutively pursued to satisfaction. `Thus, an action on a contract induced by fraud is not inconsistent with an action for damages for the deceit; * * *.' 18 Am.Jur. 139, El. of Rem. § 14 (1st ed. 1938). `A right of action on a contract and for fraud in inducing plaintiff to enter into such contract may exist at the same time, and a recovery on one of the causes will not bar a subsequent action on the other.' 50 C.J.S. Judgments § 676, p. 121 (1st ed. 1947). The courts of many states have recognized the rule that a suit on a contract and a suit for fraud in inducing the contract are two different causes of action with separate and consistent remedies." [Numerous citations in footnote omitted.] Bankers Trust Company v. Pacific Employers Insurance Company, 282 F.2d 106, 110 (9th Cir.1960), cert. den. 368 U.S. 822, 82 S.Ct. 41, 7 L.Ed.2d 27.
Pickard's estimate of lost profits of $10,000.00 on each of 58 of the 72 foot boats which had been verbally ordered (as the record shows was a custom in the sale of commercial boats at least locally), was a reasonable one. It was based on the following evidence, much of which was introduced without objection. The cost to defendants to manufacture the hull was $18,317.18, plus an agreed 20% profit to the Ashland interests, which resulted in a cost to Pickard of almost $22,000.00. Pickard estimated that "... the cost to outfit the 72 foot hull on a production line basis would be $53,000.00 in labor and materials." Retail price would be $90,000.00 for a vessel costing $75,000.00; boat sale profits of 10-15% are typical in the industry, according to the testimony. Therefore, on this basis, lost profits of $10,000.00 per boat on the 58 boats on which prospective buyers had made definite commitments was argued to the jury. Conflicting evidence was also presented as to the right of Pickard as the "sole agent" to collect $69,524.00 commissions for the sale of the 13 vessels by defendants. The jury resolved these conflicts adverse to defendants.
*724 We find no substantial merit in the assertion that the Pickard interests did not have an established business in outfitting and selling trawlers manufactured by others. Twyman v. Roell, 120 Fla. 141, 166 So. 215 (1966); cases such as Belcher v. Import Cars, Ltd., Inc., Fla.App. 1971, 246 So.2d 584 are factually dissimilar. For some twenty to twenty-five years Captain Pickard had been in maritime businesses. For instance, immediately before this venture Pickard co-owned and operated the P-K Trawlers boatyard in St. Augustine, Florida, which built and outfitted wooden shrimp trawlers. At various recent times he had acted as a broker in the sale of commercial vessels. We have earlier noted the experience and study of Pickard and his employees with regard to fiberglass commercial vessels.
Next, we discuss the issue of punitive damages. In the instant case, the evidence presents a cause of action in tort not only for deceit, an intentional tort recognized by the common law, but also for trespass to land. Evidence was presented as to the unprivileged taking, without legal process, of the vessel "Bonnie" from the boatyard leased by plaintiffs.[9] Punitive damages are recoverable under the instant circumstances. In Associated Heavy Equipment Schools v. Masiello, Fla.App. 1969, 219 So.2d 465, the court affirmed a money judgment based on a jury verdict of $1,000 compensatory and $5,000 punitive damages for plaintiff. There, plaintiff filed a complaint in two counts for breach of contract and fraud in the inducement to enter the contract. The court held that punitive damages could not be assessed for the breach of contract count, but could be awarded upon the count for fraud in the inducement. The $5,000 punitive damages were also held not excessive. In Bank of Miami v. Tambourine, Fla.App. 1969, 218 So.2d 507, the appellant bank suffered an adverse verdict of $1,000 compensatory and $2,000 punitive damages for the conversion of a boat which had been purchased for $350.00, which was affirmed on appeal. An agent of the bank and another took the boat, owned by appellee Rutkin, from the owner's apartment at night and without legal process. Such misconduct furnished a sufficient basis for the punitive damages awarded and was a proper application of the general rule in Winn & Lovett Grocery Co. v. Archer, 126 Fla. 308, 171 So.2d 214, 220-221; and the awards of punitive damages were not excessive.
Turning now to the appeal of Slama and Modern Fiber Glass, appeal No. 72-103, we consider the order granting a new trial. The order appealed sets forth these grounds:
"9. The motions of Defendants, MODERN FIBER GLASS, INC., and HAROLD L. SLAMA, made severally by paragraphs 10 through 82 of their motion for a new trial are hereby denied as to grounds asserted in paragraphs 10 through 82; the Court, upon consideration of such grounds, separately, and in relation to their cumulative effect, finds them to be without merit and insufficient cause for a new trial.
"10. The motions of Defendants, MODERN FIBER GLASS, INC., and HAROLD L. SLAMA, severally, for a new trial, are hereby granted on all issues on the following grounds:
"a.) The awards of punitive damages against these Defendants, severally, are improper in the absence of awards *725 against these Defendants, severally, for compensatory damages.
"b.) The manifest weight of the evidence was contrary to the finding for these Defendants on the issue of compensatory damages.
"c.) There are reasonable grounds to believe that the compensatory damage verdict for these Defendants and the punitive damage verdict against these Defendants may have been the result of mistake or sympathy.
"d.) Substantial justice requires a new trial as to Defendants, MODERN FIBER GLASS, INC., and HAROLD L. SLAMA, and that such trial be on all issues.
"11. The motion of the Plaintiffs for a new trial as to Defendants, MODERN FIBER GLASS, INC., and HAROLD L. SLAMA, is hereby granted on the following grounds:
"a.) The awards of punitive damages against these Defendants, severally, are improper in the absence of awards against these Defendants, severally, for compensatory damages.
"b.) The manifest weight of the evidence was contrary to do the finding for their Defendants on the issue of compensatory damages.
"c.) There are reasonable grounds to believe that the compensatory damage verdict for these Defendants and the punitive damage verdict against these Defendants may have been the result of mistake or sympathy.
"d.) Substantial justice requires a new trial as to Defendants, MODERN FIBER GLASS, INC., and HAROLD L. SLAMA, and that such trial be on all issues."
These findings were made despite the poll of the jury wherein they stated that the verdict forms returned as completed reflected their decision.
Leading Florida cases on the propriety of granting a new trial, e.g. Cloud v. Fallis, Fla. 1959, 110 So.2d 669 and Russo v. Clark, Fla. 1962, 147 So.2d 1, establish that granting a new trial is discretionary with the trial court, and his decision will not be reversed except where an abuse is clearly shown. A stronger showing is required to reverse an order allowing a new trial than to reverse one denying it.
The trial correctly determined that the jury verdicts on the merits exonerating defendants Slama and Modern Fiber Glass, but which verdicts assessed punitive damages against them, was against the manifest weight of the evidence. Cloud v. Fallis, supra. The cold record reflects that the multiple jury verdicts could have caused confusion; since the trial judge observed what transpired, we should refrain from second guessing him. The demeanor of the witnesses may have motivated the jury to act out of passion, prejudice, or bias, which may not be fully preserved in the transcript. North Dade Imported Motors, Inc. v. Brundage Motors, Inc., Fla.App., 221 So.2d 170, at 175 n. 5.
We have carefully considered all points on appeal and have concluded that no reversible error has been made to appear, therefore, the judgment and order appealed are affirmed.
Affirmed.
NOTES
[1] In an interoffice memorandum from Morrison Bump, Vice President of Ashland Chemical, a division of Ashland Oil, dated March 5, 1969 the concluding paragraph was:

"Finally, it is my personal view that all of us engaged in initial discussions with Pickard with `tongue in cheek.' Both Bob McCowan and I wrote memos expressing some concern. Harold never did feel that it would be a long association. I feel that as long as Harold has made up his mind, we should extricate ourselves from an association with Pickard using any means at our disposal."
Copies were sent to Mr. Orin Atkins, President of Ashland Oil; Messrs. R.S. Blazer, Chairman of the Board; Everett F. Wells, Arloe W. Mayne, Robert McCowan, Vice President of Ashland Oil, James H. Moore, Assistant General Counsel and Harold L. Slama.
[2] A memorandum from Slama to Robert T. McCowan, dated June 26, 1968, with copies to Messrs. R.S. Blazer and Orin E. Atkins, bore a handwritten endorsement: "7/3/68 Bob: This sounds good to me. /s/ Orin." In the body of the memo are these two paragraphs:

"If or when, we found dealing with Pickard was unsatisfactory we would then have to have our own waterfront dock for fitting out. But, if dealing with Pickard could be satisfactory for at least nine months to a year it would give us the time needed to get our feet on the ground, build additional molds for fuel tanks, decks, pilot house and be in a position to engineer the best economical methods for fitting out these boats.
"We are absolutely convinced of the market for these boats and that fiberglass will be the accepted and dominating material. We are also convinced that we can turn this into five to ten millions a year in sales."
[3] Supra Note 1.
[4] E.g., Associated Heavy Equipment Schools, Inc. v. Masiello, Fla.App. 1969, 219 So.2d 465; North Dade Imported Motors. Inc. v. Brundage Motors, Inc., Fla.App. 1969, 221 So.2d 170, 177; Rigot v. Bucci, Fla. 1971, 245 So.2d 51, 52; accord: Holbein v. Rigot, Fla. 1971, 245 So.2d 57; see: Nantell v. Lim-Wick Construction Company, Fla.App. 1970, 228 So.2d 634 and Entron v. General Cablevision of Palatka, 435 F.2d 995, 997-999 (5th Cir.1970).
[5] Brinkley v. Arnold, 98 Fla. 166, 123 So. 569; Beatty v. Lucas, 112 Fla. 265, 150 So. 239, 240; Sample v. Ward, 156 Fla. 210, 23 So.2d 81, 85; Greenwald v. Food Fair Stores Corporation, Fla.App. 1958, 100 So.2d 200; Brod v. Jernigan, Fla. App. 1966, 188 So.2d 575; Evans v. Gray, Fla.App. 1968, 215 So.2d 40.
[6] To resolve the issue of whether the requirements of the statutes of frauds, §§ 672.201 and 725.01, were met, we were required to characterize the relationship between the parties. We reviewed the record and concluded that the parties were not merely buyer and seller but joint venturers. The Ashland Oil interests were to manufacture the hulls and to supply certain financing. The Pickard group was to have the first right to purchase the hulls and outfit them, and then they were to promote the sales of the completed vessels. In addition, the Pickard group acted as consultants to the Ashland companies; to that end Pickard furnished them with plans, specifications, and a "plug" mold for the manufacture, by defendants, of still larger trawler hulls. Ashland determined the location of Pickard's Miami boat yard.
[7] See: § 671.201(39) and State v. Hickman, Fla.App. 1966, 189 So.2d 254, 258.
[8] Doelle v. Ireco Chemicals, 391 F.2d 6, 9 Williams, 145 Fla. 709, 200 So. 220, 222; (10th Cir., 1968); see: Hartsfield v. Bergman v. George, 202 Misc. 998, 117 N.Y.S.2d 27, 30, (Spec.Term, 1952); Huddleston v. Lee, 39 Tenn. App. 465, 284 S.W.2d 705, 710-711 (1955); IX Wigmore, Evidence § 2439, pp. 103-104 (3rd ed. 1940).
[9] We have searched the record for a specific allegation in or amendment of the pleadings relating to the taking, an issue not raised by appellants, however. Although we have found none, nevertheless such evidence was admitted without objection and was the subject of closing arguments. Defendants were fully apprised of plaintiffs' position respecting the taking, so no prejudice to them has been found. Instructions touched on this matter. We therefore conclude that the issues were properly before the jury as a foundation for the award of exemplary damages.