F. Browne GREGG, Plaintiff-Appellee,
Cross-Appellant,

v.

U.S. INDUSTRIES, INC., a Delaware
Corporation, Defendant-Appellant,
Cross-Appellee.

F. Browne GREGG, Plaintiff-Appellant,
Cross-Appellee,

v.

U.S. INDUSTRIES, INC., a Delaware
Corporation, Defendant-Appellee,
Cross-Appellant.

Nos. 76–2107, 81–5956.

United States Court of Appeals,
Eleventh Circuit.

Sept. 30, 1983.

Bedell, Bedell, Dittmar & Zehmer, C. Harris Dittmar, E. Earle Zehmer, William R. Dorsey, Jr., Jacksonville, Fla., for Gregg.

Olwin, Connelly, Chase, O'Donnell & Weyher, William F. Sondericker, Mary C. Mone, Gary D. Hoppe, New York City, Mathews, Osborne, Ehrlich, McNatt, Gobelman & Cobb, Raymond Ehrlich, John M. McNatt, Jr., Jacksonville, Fla., for U.S. Industries, Inc.

Before GODBOLD, Chief Judge, HENDERSON and CLARK, Circuit Judges.

GODBOLD, Chief Judge:

In 1969 Gregg owned corporate businesses in Florida engaged in construction, sand mining, and design of dredging equipment. The businesses were hard pressed for working capital. August 27, 1969 Gregg entered into an "Agreement and Plan of Reorganization" with U.S. Industries, Inc., a conglomerate, providing for a tax-free transfer of his companies to USI, for which Gregg would receive for the stock of his companies $3.5 million in common and preferred USI stock. Also, under the Agreement, as "further consideration," Gregg could receive up to $6.5 million more in USI stock if the former Gregg companies met specified profitability levels over the next five years.

As part of the Agreement, to strengthen the net worth of his companies, Gregg contributed $1 million in capital and, in addition, gave a promissory note from him and his wife for $500,000, which USI acquired along with other assets of the Gregg companies.

A separate "Employment Agreement" was signed October 1, 1969, the date of closing, under which Gregg was employed to stay on for five years as president and chief operating officer of the former Gregg companies. As part of this agreement Gregg agreed not to compete with USI.

During the five years after the acquisition, USI put some $12 million-$14 million into the former Gregg companies and guaranteed some $2 million in loans. Initially the operations were successful. Gregg received one distribution of USI stock (called by the parties "earnout stock"), valued at $871,484 and based upon 1969 profits. However, relations between Gregg and USI began to sour soon after the transaction was closed. The former Gregg businesses became less and less successful. USI began cutting back on Gregg's authority, and both parties began thinking of litigation.

During 1971 Gregg paid the first installment, $100,000 plus interest, on the $500,000 note. In May 1971 USI proposed that Gregg be removed as president and chief operating officer and be appointed a consultant, and it would continue his salary plus an expense account. Gregg agreed under protest but was given little work to perform.

In April 1970 USI considered acquiring Camp Concrete Rock Company, a Florida company, to expand the sand mining operation it had acquired from Gregg. Gregg told USI that Camp Concrete was an excellent company and that it would complement the USI sand mining operation. USI told Gregg it was not interested in acquiring Camp Concrete at the time. Later, in 1971, shortly after Gregg had been removed as president and operating officer, he learned that Camp Concrete was for sale, and he bid on it without informing USI of his decision. USI learned of the proposed sale through other sources and it too bid. Gregg was high bidder. He acquired Camp Concrete and engaged in production competitive with the USI-acquired operation.

On April 20, 1972 Gregg failed to pay the second installment on the $500,000 note and told USI he was not going to pay the note but instead would set it off against obligations USI had to him. USI stopped paying his salary. On May 24 USI requested Chemical Bank in New York, its stock transfer and dividend disbursing agent, to

stop payment on Gregg's USI dividends. Under instructions from USI to the bank, described more fully in Part V below, Chemical Bank delivered to USI Gregg's dividend checks. USI ended up holding six dividend checks totaling around $65,000. These events led to two of Gregg's claims, a claim sounding in contract for the dividends and a tort claim for conversion.

Gregg called USI on June 15, 1972 and inquired about his missing June 1 dividend check but was given no information. The same day he borrowed $135,000 from the First National Bank of Leesburg, Florida, and as security assigned all dividends from his USI stock. Both Gregg and the Leesburg bank mailed to USI notice of the assignment. Earlier, in 1971, Gregg had obtained another loan from the same bank and pledged his USI stock as collateral; it is not clear whether USI knew of this pledge before June 1972, though for purposes of this case the court assumed that it did.

On June 19 USI sued Gregg in Delaware state court on the $500,000 note, also charging him with common law deceit and breaches of contract, of warranty, of the covenant not to compete, and of fiduciary duty. On USI's motion the Delaware court entered a sequestration order, pursuant to Del.Code Ann. title 8, Sec. 169, and title 10, Sec. 366 (1975), which authorized seizure of Gregg's USI stock by a court-appointed sequestrator as a means of securing Gregg's appearance in court. Three days later USI notified Chemical Bank of the order and asked the bank to make appropriate entries in its stock transfer books.

Under Delaware sequestration procedures, Gregg could appear in court and contest the claim against him, thereby subjecting himself to in personam jurisdiction, or he could default and the sequestered property then could be used to satisfy any default judgment entered. He could appear specially only to contest the sequestration.

On June 19, the same day that USI sued Gregg in Delaware, it received notice that he had assigned his USI dividends to the Leesburg bank. USI notified the bank of the suit and the sequestration order and notified the court of the bank's interest. The bank moved to intervene and to quash the sequestration order. Gregg removed the case to the federal district court in Delaware, which denied the motion to quash the sequestration order but noted that dividends were not included in the sequestration. The court declined to order USI to send the Leesburg bank the dividends withheld from Gregg. The district court also held that the Leesburg bank could register the stock in its name or a street name and sell the stock, apply the proceeds to Gregg's indebtedness as provided by the agreement pledging the stock to the bank, and pay any excess to the sequestrator. The Leesburg bank did eventually register the stock in a street name and sell substantial amounts of the stock because its value had fallen below the margin requirements for securing the loan.[1] A small amount of money left over from these sales was turned over to the sequestrator by the Leesburg bank.

On three occasions Gregg appeared in the Delaware court. He contested the validity and constitutionalty of the Delaware sequestration procedures. Each time the court, relying on a long line of authority, upheld the validity of the Delaware procedures. *U.S. Industries, Inc. v. Gregg* (D.Del., April 24, 1975) (memorandum opinion and order), *U.S. Industries, Inc. v. Gregg*, 58 F.R.D. 469, 478–81 (D.Del.1973); *U.S. Industries, Inc. v. Gregg*, 348 F.Supp. 1004, 1018–23 (D.Del.1972).

In June 1973 Gregg demanded of Chemical Bank that it reissue his checks for June, September, and December 1972 dividends. On USI's instruction Chemical Bank refused. At one point Chemical Bank was told that the Leesburg bank would postpone

---

1. After the registration was changed the dividends thereafter payable were paid by USI to the street name holder, which endorsed them over to Gregg.

selling Gregg's stock if Chemical would send to Leesburg Gregg's withheld dividends. Chemical, on USI's instruction, refused. At some point Chemical Bank was given a letter from USI indemnifying the bank from any loss it might suffer as a result of withholding the dividends.

The district court in Delaware eventually entered a default judgment against Gregg on the note and directed that the rest of the sequestered stock be sold. After the sequestrator's fees and costs were paid, USI was paid the balance, some $18,000. Gregg appealed from this judgment to the United States Court of Appeals for the Third Circuit, which held Delaware's sequestration statute unconstitutional. *U.S. Industries, Inc. v. Gregg,* 540 F.2d 142 (3d Cir.1976), *cert. denied,* 433 U.S. 908, 97 S.Ct. 2972, 53 L.Ed.2d 1091 (1977). USI filed in the Supreme Court for certiorari. Shortly afterwards the Supreme Court held in another case that the Delaware sequestration procedures were unconstitutional, overruling its prior decisions. The Court denied certiorari on the Third Circuit case, and the district court dismissed the USI proceedings against Gregg for want of jurisdiction over the person.

Gregg then moved in federal court in Delaware for restitution for not only the amount USI had received but also the value of his stock at the time it was seized, less its value at sale. The court held that the only relief Gregg was entitled to as restitution was the amount USI had realized plus costs. Also it held that Gregg could have avoided loss by selling the sequestered stock and depositing the proceeds in its place, as permitted by the sequestration order. The Third Circuit affirmed. *U.S. Industries, Inc. v. Gregg,* 605 F.2d 1199 (3d Cir.1979), *cert. denied,* 444 U.S. 1076, 100 S.Ct. 1023, 62 L.Ed.2d 758 (1980).

The present suit was filed in Florida by Gregg in July 1972, soon after USI filed its suit in Delaware. The case first went to trial in 1974. After Gregg completed his case in chief, the court directed verdicts in favor of USI on several of Gregg's claims. The judge became ill, however, and a mistrial was declared and no judgment ever entered.

The case was assigned to another district judge. Following are the claims and counterclaims presented to and disposed of before this district judge:

### Gregg's claims

Count I: Common law fraud. Jury verdict for Gregg. $500,000 compensatory damages and $500,000 punitive damages.

Count II: Securities fraud. Jury verdict for USI.

Count III: Breach of contract. Directed verdict for USI.

Count IIIA: Quantum meruit. Directed verdict for USI.

Count IV: Action of debt for unpaid dividends on Gregg's USI stock. Withdrawn from jury. Post-trial decision by court on merits for Gregg.

Count V: Conversion of dividends on Gregg's USI stock. Severed from jury trial. Dismissed on merits by court. Post-trial.

Count VI: Interference by USI with Gregg's business relations with Leesburg, Florida bank. Same.

Count VII: Abuse of process by USI in Delaware proceedings against Gregg. Same.

### USI's counterclaims

First: Common law fraud. Jury verdict for Gregg.

Second: Securities fraud (1933 Act). Same.

Third: Securities fraud (1934 Act). Same.

Fourth: Breach of contract. Directed verdict for Gregg.

Fourth-A: Strict liability for breach of warranties. Same.

Fifth: Suit for recision of Gregg's employment contract with USI. Same.

Sixth: Breach of Gregg's fiduciary duty to USI and mismanagement. Same.

Seventh: Breach of Gregg's covenant not to compete with USI. Severed from jury trial. Dismissed on merits by court. Post-trial.

Eighth: Preemption of corporate opportunity by Gregg. Same.

Ninth: Action of debt for unpaid balance on Gregg's $500,000 note to USI. Withdrawn from jury. Post-trial decision by court on merits in favor of USI.

Tenth: Quantum meruit. Directed verdict for Gregg.

Eleventh: Procurement of watered stock by Gregg (Gregg's causing USI to issue him stock without adequate consideration). Directed verdict for Gregg.

The thrust of each party's overall case was to sue for fraud in the inducement and stand on the contract and sue for its breach, except that USI also sought recision (Fifth counterclaim).

Before trial the district judge rejected USI's argument that the court was bound by the directed verdicts ordered in the aborted jury trial. Pre-trial he severed Gregg's claim for conversion of his USI dividends. (Count V), interference with his business relations with the Leesburg bank (Count VI), and USI's counterclaims for breach of covenant not to compete (Seventh) and for preemption of corporate opportunity (Eighth).

Before trial the court told the parties that the measure of damages on the fraud claims would be the difference in fair market value, on the closing date, between stock transferred and stock received.

A jury trial was held in late 1975 and early 1976, extending over three months and consuming more than 50 trial days. At trial the court held that the contract between the parties was illusory and directed verdicts against both parties on their breach of contract claims, i.e., Gregg's Count III and USI's Fourth counterclaim. It also directed verdicts against Gregg on his quantum meruit claim (Count IIIA), and against USI on its counterclaims for breach of warranties (Fourth-A), recision (Fifth), breach of fiduciary duty and mismanagement (Sixth), quantum meruit (Tenth) and procurement of watered stock (Eleventh). At the close of all the evidence the court withdrew from the jury, and announced that it would decide post-verdict, USI's Ninth counterclaim on Gregg's $500,000 note and Gregg's contract claim for unpaid dividends on his USI stock (Count IV).

The rulings of the court before and during trial left for submission to the jury only the reciprocal fraud claims of each party against the other asserting common law fraud and securities fraud. Submission was by a series of verdicts, each general in form, directed to the claims and counterclaims. On Gregg's common law fraud claim, the jury found for him and awarded $500,000 compensatory and $500,000 punitive damages. On Gregg's securities fraud claim (Count II), the jury returned a verdict for USI. On USI's fraud counterclaims (First, Second and Third), the jury found for Gregg. A Rule 54(b) judgment was entered on these verdicts. USI appealed and Gregg cross-appealed. We ordered the appeal not calendared until the remainder of the case was decided.

In August 1980 the judge entered findings and an opinion holding for USI on the two claims withdrawn from the jury at the end of the trial (Gregg's Count IV and USI's Ninth counterclaim). He found in favor of Gregg on his Count IV claim, sounding in contract, for the unpaid dividends on his USI stock. He held for USI on its Ninth counterclaim for the balance on the $500,000 note but denied USI attorney's fees and costs as provided by the note.

Following additional amendments to the pleadings, the court, in July 1981, entered an 80-page opinion deciding all remaining issues on summary judgment and directed verdict grounds and giving its reasons for

the directed verdicts it had ordered at trial. The court held against Gregg on his conversion of dividends claim (Count V), malicious interference with business relations with his bank (Count VI), and abuse of process in the Delaware suit (Count VII). Gregg appealed and USI cross-appealed. We consolidated the two appeals.

## I. Introductory issues

■ The court was not required under law of the case principles to adhere to directed verdicts ordered by the first judge at the aborted trial. Ordinarily law of the case applies only where there has been a final judgment and not to interlocutory rulings. *U.S. v. United Smelting, Refining & Mining Co.,* 339 U.S. 186, 199, 70 S.Ct. 537, 544–45, 94 L.Ed. 750 (1949). Following the aborted first trial there was no final judgment. Moreover, in his post-trial orders the district judge states that he agreed with some of the directed verdicts ordered by the first judge; he ordered judgment entered on some claims based upon his own examination of the record (on directed verdict grounds or summary judgment grounds) as well as upon the first judge's directed verdict on those claims. He was not bound to give absolute effect to the first judge's rulings, and he did not do so. Nor was he precluded from accepting them as part of the persuasion process. In any event, in each instance, as an alternative, he carefully exercised his own power and duty of independent decision.

■ Gregg demanded a jury trial, but there was no Seventh Amendment violation. Each post-verdict ruling was within either the power of the court to enter a directed verdict or summary judgment under Rule 56.

## II. The validity of the jury verdicts

### (A) The statute of frauds and the parol evidence rule

On Gregg's common law fraud claim the jury awarded him $500,000 compensatory and $500,000 punitive damages. The crux of this claim is fraudulent inducement: that USI fraudulently promised to provide Gregg's former businesses with capital required for their successful operation, when in fact USI's established financial policies severely limited the cash that it could make available to him for additional working capital; and that USI fraudulently promised to employ him to operate and manage the former Gregg companies when it did not intend to continue him in this position. USI contends on numerous grounds that the trial court erred in denying its motions for directed verdict and for judgment n.o.v. on this fraud claim.

USI's undertaking to provide additional working capital is in paragraph 3(g) of the reorganization agreement:

> (g) USI agrees to add such additional working capital as may reasonably be required for the expansion of the business. It is further contemplated that USI will make available an amount approximating $400,000 in 1969 and $800,000 in 1970 for additions to plant and equipment. However, consistent with USI's obligations to shareholders, all of the foregoing shall be done within and subject to the normal operating financial policies of USI.

USI asserts that Gregg's fraudulent inducement claim with respect to working capital is barred as a matter of law because it is based solely on oral statements that are within the Florida statute of frauds, Fla. Stat.Ann. Sec. 725.01, because the statements concern promises that could not take place within one year.[2] The purpose of the statute of frauds is to prevent fraud and perjury by requiring specified transactions to be evidenced by a writing signed by the party to be charged. *Rowland v. Ewell,* 174 So.2d 78 (Fla.Dist.Ct.App.1965). USI maintains that Gregg, under the guise of a fraud claim, is seeking to enforce an oral agree-

---

**2.** Fla.Stat.Ann. Sec. 725.01 provides in pertinent part:

No action shall be brought ... whereby to charge the defendant ... upon any agreement that is not to be performed within the space of one year from the making thereof ... unless the agreement or promise upon which such action shall be brought, or some note or memorandum thereof shall be in writing and signed by the party to be charged

ment concerning working capital that is unenforceable under the statute of frauds.

■ Under Florida law a fraud action may not be used to recover for breach of an unenforceable oral contract. *Canell v. Arcola Housing Corp.,* 65 So.2d 849, 851 (Fla. 1953). Nor may recovery be had for fraudulent inducement to enter an unenforceable oral contract. *Ashland Oil, Inc. v. Pickard,* 269 So.2d 714, 721 (Fla.Dist.Ct.App.1972), *cert. denied,* 285 So.2d 18 (Fla.1973). But if an enforceable contract is entered, prior oral agreements and other representations that caused the party to enter the written agreement may be used to prove fraud. *See, id.; see e.g., Nantell v. Lim-Wick Construction Co.,* 228 So.2d 634 (Fla.Dist.Ct. App.1970) (oral agreement admitted into evidence to show fraudulent inducement to enter a written real estate transaction); *North Dade Imported Motors, Inc. v. Brundage Motors, Inc.,* 221 So.2d 170, 177 (Fla.Dist.Ct.App.), (oral inducement to enter franchise agreement must be evaluated in interpreting the written instrument), *cert. denied,* 226 So.2d 817 (Fla.1969); *Associated Heavy Equipment Schools, Inc. v. Masiello,* 219 So.2d 465 (Fla.Dist.Ct.App. 1969) (fraudulent advertising inducing student to enter written contract to take correspondence course admitted into evidence to prove fraud). Here the parties entered into a written contract sufficient under the statute of frauds. Gregg's evidence of fraudulent inducement to enter that contract is not barred by the statute.

■ Nor is there any merit in USI's argument that the parol evidence rule prohibits admission of the evidence. The parol evidence rule precludes the admission of parol or extrinsic evidence to contradict or vary the terms of a written instrument. *Greenwald v. Food Fair Stores Corp.,* 100 So.2d 200, 202 (Fla.Dist.Ct.App.1958). Although a party cannot use a claim of fraud to contradict or vary the terms of a written contract, *id.,* the parol evidence rule has no application where the claim is for fraudulently inducing a party to enter into the writing. *Ashland Oil, Inc.,* 269 So.2d at 722. The rule in *Greenwald* is directed, for example, to preventing a party who has contracted expressly for 10 items from claiming he was promised 20 items. Here the contractual language of the working capital provision is not specific in amount; so evidence of negotiations and the parties' intent does not contradict or vary the express terms of the contract. Extrinsic evidence is admissible to explain and clarify provisions that are indefinite on their face. *See Royal American Realty, Inc. v. Bank of Palm Beach & Trust Co.,* 215 So.2d 336, 338 (Fla. Dist.Ct.App.1968); *cf. Tobias v. Lynch,* 192 A.D. 54, 182 N.Y.S. 643, 644–45 (1920), *aff'd,* 233 N.Y. 515, 135 N.E. 898 (1922). The evidence here is admissible both for the purpose of showing fraud in the inducement and for the purpose of explaining the intent of paragraph 3(g).

### (B) Sufficiency of the evidence

■ USI also contends that the judgment against it for fraud should be reversed because the promises claimed to be fraudulent were never made, and if made were performed, and in any event were not relied upon by Gregg, and if Gregg did rely he did not prove that he was damaged. These contentions are developed in the briefs of the parties at great length. There is a succinct answer. All of these were jury issues, and no basis is shown for this court to interfere with the jury's conclusions.

### (C) Exclusion of the "earnout stock" from the calculation of damages

Before trial the court informed counsel that the measure of damages on the fraud claims would be the difference in the fair market value, on the closing date, of the stock the prevailing party gave up and the stock the prevailing party received. At trial the court instructed:

therewith or by some other person by him

thereunto lawfully authorized.

Damages under the common law of fraud and the Federal Securities Law are measured the same way. The prevailing claimant is entitled to receive in money the difference in value between what he gave up and what he received at the closing of the acquisition on October 20, 1969. For example, in assessing money damages in Gregg's favor, you would determine the difference in value between the stock he gave USI and the USI stock he received in exchange. In assessing money damages in USI's favor, you would make the same calculation, determining the difference in value between the stock USI gave Gregg at closing and what it received in return from him. In summary, what you are called upon to do in the event you find either party entitled to recover against the other, is to determine the value of Gregg's stock and USI's stock—that is the exchange of stock—at closing.

Therefore, in calculating Gregg's damages, measured as of the date of closing, the jury could not treat as consideration flowing to him, and thus as an element decreasing his damages, the value of his right to earn and receive "earnout stock." USI requested, and was refused, a jury instruction that this stock was to be deducted from any damages suffered by Gregg.

 We hold that the jury instructions were erroneous. The parties agreed that Gregg's right to receive additional USI stock based on profits of his transferred companies was additional consideration for the Gregg shares that he transferred to USI. Paragraph 3 of the Plan and Agreement, titled "Consideration for Shares" provides in subparagraph (b)(i) that "as further consideration for the [Gregg] shares to be transferred to USI [on the closing date]," USI shall issue and deliver to Gregg "an additional number of shares of [USI] common stock," determined on the basis of a prescribed formula, if pre-tax profits of the

former Gregg companies for 1969 exceed $800,000. A method of valuing the USI stock to be issued is included, based on average daily closing price of USI stock during a prescribed month. Gregg cannot receive more than $500,000 worth of common stock under this subparagraph.

Subparagraph (ii), in like language, provides for additional USI stock "as further consideration" for Gregg's shares to be transferred, based upon 1970 pre-tax profits exceeding $1.2 million, with a maximum of $1 million worth of common stock.

Paragraph (c) covers a somewhat different calculation of stock as further consideration for Gregg shares transferred, based on pre-tax profits for 1969 and 1970 and also for 1971 through 1973.[3]

The Agreement also contains elaborate provisions concerning calculation of pre-tax profits and for alternative arrangements if any of the former Gregg companies is sold.

Nothing in the Agreement says, implies or hints that the right to receive additional USI stock is anything other than what the Agreement says, "further consideration for the [Gregg] shares to be transferred to USI." The Employment Agreement, executed approximately two months later at closing, does not purport to attribute the right to receive USI stock to consideration for Gregg's employment. Gregg is authorized a salary of $50,000 per year, participation in USI's bonus and stock option plans, and death and disability benefits. He agrees not to compete. The only reference to the earnout stock is this:

12. Referring to the Agreement, at such time as USI shall have issued and delivered to or for the benefit of Executive the maximum amount of additional shares of USI stock and any other consideration as may be paid under the Agreement, Executive or Seller or USI at any time thereafter may on ninety days' advance written notice terminate his employment agreement.

---

**3.** The interrelationship between this calculation for 1969 and 1970 and the calculations provided in (b) for the same years is not apparent to us. But this is not relevant to our decision.

USI's Tenth counterclaim asserted that Gregg was unjustly enriched because he transferred stock in Gregg companies having a negative net worth and received from USI stock valued at $4,771,484 (consisting of $3,500,000 of stock at closing and $871,-484 of stock thereafter), "as additional consideration." To this Gregg answered: "[Gregg] admits that USI subsequently delivered to Gregg USI stock having a value of $871,484 as *additional consideration* for the Gregg shares delivered to USI." (emphasis added).

Pretermitting whether the parol evidence rule would permit extrinsic evidence varying these specific provisions, nothing of substantial importance occurred at trial that varied or contradicted the terms of the written instruments. There was testimony for witnesses from both sides that the earnout stock was part of the consideration for Gregg's stock. In addition to Gregg's answer quoted above, other pleadings and memoranda filed by Gregg referred to the earnout stock as additional consideration. USI was entitled to the instruction that it requested, directing that the earnout stock (or the right to receive it) was part of Gregg's consideration.

It is not clear to us why the district judge excluded the earnout stock from the calculation of consideration given by USI. There is a colloquy in which he seemed to say that to include it within the consideration would be inconsistent with testimony by USI officers that Gregg earned the stock by achieving the required profitability levels in 1969. But using earnings as a device for measuring the amount of stock, if any, to which Gregg would be entitled, does not alter or limit the bargain struck.

Gregg's argument to us that as a matter of law nothing that occurred after the closing date could affect the damages confuses the separate substantive issues of what the parties agreed to and what the valuation is of the bargain. Moreover, the earnout provision is not too speculative and uncertain to be considered in calculating damages. The valuation of the right to receive more stock is not necessarily any more speculative than establishing anticipated profits, which are recoverable in both tort and contract actions in Florida if the amount of the loss is proved with a reasonable degree of certainty even though it cannot be proved with exactitude. *See Pallardy-Watrous Insurance Agency, Inc. v. Tucker,* 120 Fla. 895, 163 So. 284 (1935); *Talisman Sugar Corp. v. Farmland Development Co.,* 156 So.2d 392 (Fla.Dist.Ct.App.1963); *see also Innkeepers International, Inc. v. McCoy Motels, Ltd.,* 324 So.2d 676, 679 (Fla. Dist.Ct.App.1975) (recovery of anticipated profits not generally allowed for injury to a new business with no history of profits but may be recovered for injury to established business), *cert. denied,* 336 So.2d 106 (Fla. 1976). Indeed, valuation of Gregg's stock as of closing necessarily includes the earning or profit potential of his companies, which was the basis for measuring the amount of earnout stock he would receive. Moreover, the uncertainty in amount of the earnings/profit potential and its function, the earnout, were reduced by trial time because these amounts had become known. In determining the true value of consideration given, later developments may be considered. *See Austin v. Loftsgaarden,* 675 F.2d 168, 181 (8th Cir.1982) (reversible error to refuse to allow defendants in fraud action to prove the economic benefits in the form of tax advantages eventually received by plaintiffs because of tax shelter defendant sold to plaintiffs); *Dupuy v. Dupuy,* 551 F.2d 1005, 1025 (5th Cir.) (later developments could be considered in valuing stock of a closely held corporation in a fraud suit), *cert. denied,* 434 U.S. 911, 98 S.Ct. 312, 54 L.Ed.2d 197 (1977); *Titan Group, Inc. v. Faggen,* 513 F.2d 234, 239–40 (2d Cir.), *cert. denied,* 423 U.S. 840, 96 S.Ct. 70, 46 L.Ed.2d 59 (1975) (a note that included valuable conversion rights was properly valued at its later value, the amount eventually paid, though the cash value of the note at the time of closing was substantially less).

The correctness of the jury instruction on damages was adequately raised by USI. *See Marshall v. Isthmian Lines,* 334 F.2d 131, 137 n. 13 (5th Cir.1964). The court had announced before trial what its instruction on measure of damages would be, and it adhered to its announcement. Under the instruction given the right to receive earnout stock *could not be* considered as part of a payment for Gregg's stock. USI requested, and the court denied, an instruction that it *must be* considered.[4]

### III. The effect of the jury verdicts

■ The jury verdict for Gregg on the issue of common law fraud stands, but, because of the error in instructions, the assessment of compensatory damages cannot stand. However, USI's argument that once it is recognized that the damages were calculated under an incorrect instruction, Gregg as a matter of law was not injured, therefore he no longer had a cause of action for common law fraud, is frivolous. The basis of Gregg's fraud claim is USI's alleged fraudulent promises to provide sufficient capital for successful operation of the former Gregg companies and to employ Gregg to operate and manage his former companies. Balancing of the value of stock reciprocally transferred, or to be transferred, is unrelated to Gregg's allegations of fraud.

■ This leaves the question of what happens to the $500,000 award of punitive damages. We would have thought that under Florida law punitive damages are not recoverable in a tort action unless the jury finds the defendant liable for compensatory, or at least nominal, damages. *McLain v. Pensacola Coach Corp.,* 152 Fla. 876, 13 So.2d 221 (1943); *Hanft v. Southern Bell Telephone & Telegraph Co.,* 402 So.2d 453 (Fla.Dist.Ct.App.1981); *Hauser Motor Co. v. Byrd,* 377 So.2d 773, 775 (Fla.Dist.Ct.App. 1979). We are now not certain. In *Eglin Federal Credit Union v. Curfman,* 386 So.2d 860, 862 (Fla.Dist.Ct.App.1980), the district

court of appeals held that the jury's failure to assess compensatory damages did not preclude award of punitive damages where the special verdict form used by the jury expressly found the party liable for the tort. The jury verdict here found that USI defrauded Gregg, and we have held that this verdict stands. We remand to the district court for it to give first consideration to the viability of the award of punitive damages, an issue of Florida law that has been neither briefed nor argued to us.

■ USI contends that the faulty instruction on damages reversibly affected its counterclaims asserting common law fraud (First) and securities fraud (Second and Third), on which the jury found in favor of Gregg. It argues that the basis for the jury's verdict might be that although Gregg committed fraud USI suffered no injury, and such a finding of no injury might have been brought about by the court's incorrectly excluding the right to receive earnout stock from calculation of the consideration given up by USI on the closing date. The several possible verdicts submitted to the jury included in each a unit covering liability and a second component assessing damages (with a blank for the amount of damages). The verdict returned on USI's counterclaims was only the liability component, "We find for Gregg on USI's counterclaim against Gregg." As the case was presented to and decided by the jury, nothing supports USI's contention that this verdict on liability in favor of Gregg was based upon a jury conclusion that Gregg had committed fraud but USI had suffered no damages.

### IV. The holding that the overall agreement between the parties was illusory

■ At trial the court directed a verdict against both parties on their breach of contract claims (Gregg Count III, USI's Fourth counterclaim), on the ground that para-

---

4. . Thus we do not need to rest our decision on plain error. *See Rodrigue v. Dixilyn Corp.,* 620 F.2d 537, 540 (5th Cir.1980) (an erroneous instruction that probably leads to an incorrect verdict and substantial injustice constitutes plain error).

graph 3(g) of the Agreement, quoted above, was illusory (or unenforceable, see discussion below), which rendered the entire contract between the parties, both the Plan and Agreement and the Employment Agreement, unenforceable. We hold that this was error.

Speaking from the bench when it directed a verdict, the court described paragraph 3(g) as unambiguous in its language but vague and illusory; also the court stated that 3(g) was ambiguous in its legal effect. In its opinion filed in July 1981 the court held that the two agreements were part of a single transaction and constituted an indivisible contract. It found that the working capital provision of paragraph 3(g) was illusory and rendered the indivisible contract unenforceable, with the result that USI could not recover for breach of warranties given by Gregg in the Plan and Agreement or for breach of Gregg's covenant not to compete contained in the Employment Agreement.

Reading together the court's statements from the bench and the 1981 opinion, the court appears to have intermingled two concepts: the traditional concept of illusoriness, that is, that a promisor having complete discretion whether or not to perform has in fact made no promise at all, and therefore there is no contract; and the concept of vagueness and indefiniteness, that is, a promisor has made an identifiable promise so that a contract exists, but the content of the promise is so vague and uncertain that it cannot be enforced, and therefore the entire contract is unenforceable. Before us the parties have also intermingled these concepts. From the colloquy between court and counsel at trial and the 1981 opinion, we tend to think that the court had in mind only illusoriness, that is, that USI was not obligated at all to contribute capital under paragraph 3(g), so that no contract existed. However, neither in its statements from the bench nor in its written opinion did the court explicitly explain why it reached its conclusion that the un-

dertakings between the parties were illusory. Since the parties have discussed both illusoriness and vague and indefinite contracts, we do also.

■■■ With respect to illusoriness, Gregg points to the last sentence of 3(g):

However, consistent with USI's obligations to shareholders, all of the foregoing shall be done within and subject to the normal operating financial policies of USI.

and says that this gives USI complete discretion whether to perform; that is, USI has not bound itself at all by a promise. This argument is not consistent with New York law. New York has taken the lead in recognizing that an obligation of good faith is implied in every contract. *See* Corbin on Contracts Sec. 654A (Kaufman Supp.1982). An employment contract that included no expression binding the plaintiff to do any work for the defendant was not illusory, because the contract contained an implied promise that plaintiff would use reasonable efforts to fulfill the business intent of the contract, which was to market defendant's fashion endorsements and designs. *Wood v. Lucy, Lady Duff-Gordon*, 222 N.Y. 88, 118 N.E. 214 (1917). *See also Kirke La Shelle Co. v. Paul Armstrong Co.*, 263 N.Y. 79, 188 N.E. 163, 167 (1933) (every contract contains an implied covenant of good faith and fair dealing). There may be a valid contract even where the contract expressly gives one party "absolute discretion" to perform. *Richard Bruce & Co. v. J. Simpson & Co.*, 40 Misc.2d 501, 243 N.Y.S.2d 503, 506 (Sup.Ct.1963) ("absolute discretion" means a discretion based on fair dealing and good faith—a reasonable discretion). *See also A.W. Fiur Co. v. Ataka & Co.*, 71 A.D.2d 370, 422 N.Y.S.2d 419, 422 (1979) (a provision giving "absolute and exclusive right to reject any order for any reason whatsoever" does not give the defendant the right arbitrarily to refuse to perform).

■■■ We must give the last sentence of paragraph 3(g) a reasonable interpreta-

tion consonant with the overall purpose of the provision. *See Mandel v. Liebman,* 303 N.Y. 88, 100 N.E.2d 149, 153 (1951). The sentence can reasonably be interpreted as an attempt on USI's part to limit its obligation to provide working capital by taking into account its own overall financial condition and obligations rather than an attempt to avoid all duty to provide working capital to the Gregg businesses. Thus we conclude that under New York law paragraph 3(g) is not illusory.[5]

Turning to vagueness and uncertainty, finding a contract unenforceable for indefiniteness is "at best a last resort." *Heyman Cohen & Sons v. M. Lurie Woolen Co.,* 232 N.Y. 112, 133 N.E. 370, 371 (1921). A promise to be enforceable must be sufficiently certain and specific so that what was promised can be ascertained, *Joseph Martin, Jr., Delicatessen, Inc. v. Schumacher,* 52 N.Y.2d 105, 436 N.Y.S.2d 247, 417 N.E.2d 541, 543 (1981). Indefiniteness must reach the point where construction becomes futile. *Heyman Cohen,* 133 N.E. at 371. The test of definiteness is whether the intent of the parties may be ascertained to a reasonable degree of certainty. *Varney v. Ditmars,* 217 N.Y. 223, 111 N.E. 822, 824 (1916); *Banker's Trust Co. v. Steenburn,* 95 Misc.2d 967, 409 N.Y.S.2d 51, 62 (Sup.Ct.1978). Reasonable certainty can be derived by reference to outside matters and surrounding circumstances. *Id.* The courts give a practical construction to the parties' expressed intent.

In *Stern v. Premier Shirt Corp.,* 260 N.Y. 201, 183 N.E. 363 (1932), a provision for the seller of a business to provide the buyer with working capital "sufficient ... to carry on the business" was upheld. The court noted that this type of agreement is common enough among businessmen to have ascertainable meaning and concluded that:

> [A]ll the parties—and particularly the defendants [sellers] were familiar with the financial requirements of the business and knew well what would be sufficient to carry it on. That required amount is susceptible of proof and hence the agreement may not be said to have been indefinite.

*Id.* at 364.

Here, as in *Stern,* the buyer and seller of a business have included a provision for injecting working capital into the business without stating a precise amount of capital to be provided. Although the parties in *Stern* had previously worked together in the business, that element was not critical in the court's reasoning. *See Banker's Trust Co. v. Steenburn,* 95 Misc.2d 967, 409 N.Y.S.2d 51, 62 (Sup.Ct.1978) (the parties' mutual knowledge of the business's financial needs is critical rather than the means by which they acquire that knowledge). In *Steenburn,* the challenged agreement was between a bank and its borrowers. The bank agreed to lend start-up money for the borrowers' new business. Relying on *Stern,* the court held the agreement not indefinite. *Id.* at 62. The court emphasized that the bank had examined the cash flow projections of the business and the parties had discussed the anticipated needs of the business even though no exact amount was decided upon. *Id.* This created "sufficient frames of reference that could, with reasonable certainty, fix the bank's obligation." *Id.* at 63. Here too the parties discussed at length the working capital needs of the business, and USI examined the financial records of the business. Both parties had business experience. They negotiated over the language of 3(g) with both sides represented by counsel and reached agreement on the language to be used. These circumstances provided the requisite frames of reference that a factfinder could use to fix the obligation.

New York cases that Gregg relies on in urging indefiniteness are distinguishable.

---

5. This conclusion makes it unnecessary for us to consider USI's alternative argument that even if 3(g) is illusory the deficiency is remedied by the additional, and finitely measured, consideration flowing to Gregg from the earn-out stock provisions.

Most involve disputed oral contracts where there was substantial doubt about whether the parties even reached an agreement. *See, e.g., Varney v. Ditmars,* 217 N.Y. 223, 111 N.E. 822 (1916) (an alleged oral promise by an employer to provide an employee with "a fair share" of the profits); *Trimmer v. Van Bomel,* 107 Misc.2d 201, 434 N.Y.S.2d 82 (Sup.Ct.1980) (a "palimony" case concerning an alleged oral agreement by which a wealthy widow was to pay her former male companion "costs and expenses for sumptuous living and maintenance for the remainder of his life"); *Silvera v. Safra,* 79 Misc.2d 919, 361 N.Y.S.2d 250 (Sup.Ct. 1974) (an admittedly illusory oral promise to "add capital or arrange for additional financing" with defendant to retain an unlimited right to decide on the nature and extent of performance; this contract also had an illegal objective); *Garcin v. Granville Iron Corp.,* 137 Misc. 648, 244 N.Y.S. 145 (Sup.Ct.1930) (an alleged oral contract to provide "large sums of money as might be required" to the defendant which was inconsistent with terms of a written contract between the parties providing for specific amounts to be loaned and also was found by the court to be a sham interposed only to delay judgment). We conclude, therefore, that the contract was not unenforceable because too vague and indefinite.[6]

In his July 1981 order the trial judge referred to his having directed verdicts against Gregg on his quantum meruit claim (Count IIIA), and against USI on its counterclaims for breach of warranty (Fourth-A), recision (Fifth), breach of fiduciary duty and mismanagement (Sixth), quantum meruit (Tenth) and procurement of watered stock (Eleventh). He did not, however, give his reasons for these directed verdicts. Possibly the rulings on USI's breach of warranty counterclaim, and its counterclaim for breach of fiduciary duty and mismanagement, are based upon the conclusion that the contract was illusory. We are in the dark as to the reasons for the rulings on the reciprocal quantum meruit claims,[7] the recision claim,[8] and the procurement of watered stock claim. We therefore vacate all of these directed verdicts set out in this paragraph, without prejudice to the district court's reconsidering them.

### V. Gregg's claim for conversion of his dividends

Gregg alleged that USI converted his dividend checks, and alternatively the funds they represented, for June, September, and December 1972. The court in its July 1981 order granted summary judgment for USI on this claim. The claim has been extinguished to the extent of compensatory damages by the judgment entered for Gregg on his breach of contract claim for his withheld dividends, but the claim for punitive damages was not extinguished. Gregg asserts he was entitled to have the punitive damages issue submitted to the jury. Punitive damages are available for conversion under both Florida law and New York law.[9]

Beginning with the USI dividend payable June 1, 1972 and continuing through dividends payable December 1972, a total of six dividends, USI intercepted from the channels of payment the dividends payable to Gregg and held them under its control. To cover each dividend declared USI transfer-

6. USI also contends that even if 3(g) was indefinite the contract became enforceable by USI's part performance consisting of substantial infusions of capital.

7. We leave to the district court whether these two survive our finding that there was a non-illusory express contract.

8. Possibly it fell out as a remedy inconsistent with the other remedies that USI sought.

9. *Adjustment Specialists, Inc. v. Collection Bureau of Orlando, Inc.,* 221 So.2d 443, 445 (Fla. Dist.Ct.App.1969); *Doral Country Club Inc. v. Lindgren Plumbing Co.,* 175 So.2d 570, 571 (Fla.Dist.Ct.App.1965), *cert. denied,* 179 So.2d 212 (Fla.1965), *aff'd on other grounds,* 196 So.2d 242 (Fla.Dist.Ct.App.1967); *Goodrich v. Malowney,* 157 So.2d 829, 834 (Fla.Dist.Ct.App. 1963); *Manekas v. Allied Discount Co.,* 6 Misc.2d 1079, 166 N.Y.S.2d 366, 369 (Sup.Ct. 1957).

red from its account in Chemical Bank, in New York, to a special dividend account in the same bank, sufficient funds to pay the dividend to all stockholders including Gregg.

USI first requested Chemical Bank on May 24, 1972 to stop payment of the dividend payable to Gregg on June 1. Dividends had been declared and were due June 1 on preferred stock and June 19 on common stock. The bank told USI that checks already had been prepared for both payments and that so long as Gregg was a shareholder of record checks would continue to be made to him automatically by the bank's computer. USI then instructed the bank to cancel Gregg's June checks, to send them to USI, and to change Gregg's mailing address so that future dividend checks payable to him would come to USI rather than to him. The bank "pulled" the June 1 check and later the June 19 check, placed both in its vault, and several months later marked them "void" and sent them to USI. On June 15 Gregg called USI and inquired about his missing June 1 check, but USI gave him no information. of its whereabouts. Two checks for September dividends and two for December, payable to Gregg, were "pulled" by the bank and sent to USI, which ended up in possession of six checks totaling about $65,000.[10] Officers of USI discussed ways that it could realize the funds represented by the checks, but it made no effort to carry through. Until trial the funds out of which the checks were payable remained in the special dividend accounts at Chemical Bank, and USI maintained possession of Gregg's checks. As already described, Gregg demanded of Chemical Bank that it reissue his dividend checks, and on USI's instruction the bank refused. Also the Leesburg Bank offered to postpone selling Gregg's pledged stock if Chemical would send it Gregg's withheld dividends, and Chemical, on USI's instruc-

tion, refused. In summary, USI exercised control over where Gregg's dividend checks would be sent, over the checks themselves, and over the dividend accounts and the funds in the accounts.

In granting summary judgment the district court applied New York law to define conversion [11] as follows:

> Any unjustified exercise of dominion over property by one who is not the owner of the property and who is not entitled to possession of the property which interferes with the right to possession of another who is lawfully entitled to such possession.

In measuring whether there was a conversion under New York law, the court held that under New York [conflict of laws] rules, the law of the state in which a corporation is incorporated governs the fiduciary obligations of the corporate officers and the general relations between shareholders and management. Thus the court looked to the law of Delaware, where USI was incorporated, to determine if the corporation had committed acts with respect to Gregg that were within the New York definition of conversion.

USI asserts, and Gregg does not dispute, that its declaration of each dividend created a debtor-creditor relationship between it and Gregg. It says that Gregg owed it a liquidated sum on the $500,000 note, that it could properly withhold Gregg's dividends as an offset, and that its doing so was not, in the words of the New York law, an "unjustified exercise of dominion over property which Gregg was lawfully entitled to possess." USI puts forward no other legal basis for its actions than its assertion that it was entitled to and did offset the dividends against Gregg's obligation on the note.

As the predicate for his conversion theory Gregg relies upon cases holding that once a corporation that has declared a dividend

---

**10.** Whether Gregg's address was changed as USI requested is not clear.

**11.** Gregg says that Florida law should have been applied but acknowledges that it is "essentially identical" to New York law.

sets aside an identified fund for the payment of the dividend, it becomes a trustee for the benefit of the shareholders entitled to the dividend.[12] Gregg asserts that USI, as trustee, exercised dominion over trust assets of which he was the beneficiary and that he was entitled to possess, and claimed the same adversely to him as beneficiary, and thereby USI became a converter.

The district court did not address the viability under New York law of Gregg's theory that a trust relationship was created. Rather, accepting the trust theory arguendo, the court adopted USI's position that it acted justifiably because it withheld Gregg's dividends as an offset against his liability on the note. There was no such justification. Under the undisputed facts USI did not engage in an offset at all. Under New York law setoff is complete when three steps have been taken: a decision to exercise the right, some action that accomplishes the setoff, and some record evidencing that the right of setoff has been exercised. *Clarkson Co. v. Shaheen,* 533 F.Supp. 905, 925 (S.D.N.Y.1982); *see also Aspen Industries, Inc. v. Marine Midland Bank,* 74 A.D.2d 59, 426 N.Y.S.2d 620, 622 (1980), *rev'd on other grounds,* 52 N.Y.2d 575, 439 N.Y.S.2d 316, 421 N.E.2d 808 (1981) (setoff does not automatically occur each time a bank holds a matured debt of the depositor; a binding overt act must actually be made).

USI failed on all three prongs of the New York requirement. It directed that Gregg's checks be held and turned over to it, and it held control of the checks and of the funds in the dividend accounts that consisted of Gregg's dividends. But it did not offset. It merely exercised—and retained—control pending hostilities,[13] while reserving to itself the right to assert—and asserting—at 100 cents on the dollar the very claims that it now says the dividends were offset against. In the abortive Delaware suit USI claimed $400,000, the full principal amount of Gregg's note, plus interest, and in an ex parte hearing proved up its claim in this amount. *U.S. Industries, Inc. v. Gregg,* 348 F.Supp. 1004, 1009 (D.Del.1972). The Leesburg bank intervened in the Delaware case seeking to protect its interest in the withheld dividends and to quash the sequestration order. The court declined to protect the bank but clarified that no dividends were included in the sequestration. USI never paid the withheld dividends to the bank.

When later sued in this case by Gregg, USI asserted its rights under the note without recognizing any offset. To the contrary its claim excluded the possibility of an offset. USI counterclaimed for the full principal amount of the note (less the initial $100,000 payment) and alleged that no part of this indebtedness had been paid. While not evidencing any reduction in Gregg's note through applying the withheld dividends, when USI answered Gregg's contract claim it denied that it owed him the dividends he claimed. USI secured a judgment for the full $400,000 of unpaid principal plus interest from due date with no credit for either the principal of the with-

---

12. *See, e.g., Sherry v. Union Gas Utilities,* 171 A. 188 (Del.Ch.1934); *accord In re Interborough Cons. Corp.,* 267 F. 914 (S.D.N.Y.1920); *Ford v. Easthampton Rubber Thread Co.,* 158 Mass. 84, 32 N.E. 1036 (1893); *Hunt v. O'Shea,* 69 N.H. 600, 45 A. 480 (1899). The rule has been codified in the Uniform Trusts Act Sec. 2(1):

> Whenever a bank account shall, by entries made on the books of the depositor and the bank at the time of the deposit, be created exclusively for the purpose of paying dividends, ... [bond coupons, employee benefits, etc.], and the depositor at the time of opening such account does not expressly otherwise declare, the depositor shall be deemed a trustee of such account for the creditors to be paid therefrom, subject to such power of revocation as the depositor may have reserved by agreement with the bank.

13. *See* Brief of ISI, No. 81–5956, at 6: "USI decided to leave the funds represented by the checks with Chemical in the dividend disbursing accounts awaiting the outcome of this litigation."

held dividends or the interest thereon. Gregg did not secure the economic value of his dividends by an offset but through suing USI for his dividends on a contract theory and obtaining a judgment. USI's course of conduct is the antithesis of offset.[14]

Because the court erred in accepting USI's offset theory, the conclusion that USI was not guilty of conversion must be reversed. Whether, with this contention out of the way, USI is guilty of converting either checks or dividends, or both, is an issue for the district court.[15]

## VI. Gregg's claim for interference with contract relations

Gregg claims (Count VI) that USI maliciously interfered with contractual relations between him and the Leesburg bank by interrupting the dividend checks that had been assigned to the bank. The district judge entered judgment for USI on alternative summary judgment and directed verdict grounds. His basis was that, assuming USI's actions in withholding Gregg's dividend checks were an interference with relations between Gregg and the bank, USI's action was justified as a matter of law because it was exercising its right to setoff. The district court noted that there was evidence of ill will between the parties and "allegations by Gregg" that the officers of USI were harassing him. But, the court held, the corporation officers had good reason to act to protect the company's interest and they exercised a legally recognized right of setoff.

■■■ USI was not entitled to judgment as a matter of law on this claim. The district court's theory that as a matter of law USI was "reasonably justified" is fatally flawed by its erroneous conclusion that USI was exercising a legally recognized right of offset. See *supra* Part V. Moreover, the court noted that there was evidence of ill will between the parties and "allegations by Gregg" that officers of USI were harassing him; there were not merely allegations that USI was harassing Gregg but actual testimony to this effect.

Both USI and the district court appear to say that because Gregg in an election of remedies "affirmed" the overall transaction, and because it could not be unscrambled by recision, he could not recover on the interference with business relations claim. Election of remedies concerning the transaction between Gregg and USI and difficulties of restoring the status quo are unrelated to any right to recover for allegedly tortious acts done by USI and affecting Gregg's relations with his bank.

## VII. Gregg's abuse of process claim

■■■ The district court correctly found that Gregg failed as a matter of law on this claim that USI abused Delaware process by the sequestration suit. Delaware has adopted Prosser's test, W. Prosser, *Law of Torts* Sec. 121, at 856, 857 (4th ed. 1971), requiring an ulterior purpose and a willful act in the use of the process not proper in the regular conduct of the proceedings. *Unit, Inc. v. Kentucky Fried Chicken Corp.,*

---

**14.** Compare USI's failure to offset in this case with its actions several years later, in a controversy between USI and other persons who had sold control of a company to it through an exchange of stock. *U.S. Industries, Inc. v. Anderson,* 579 F.2d 1227 (10th Cir.1978). USI sued the sellers charging fraud, breach of employment obligations, and breach of fiduciary duties. Thereafter USI sent defendants a letter saying:

The amount of the dividends due you or to become due you on your Special Preference Stock, Series O, will be paid by offsetting the same against the amount due from you to USI as alleged in its complaint in the action which is now pending against you in the U.S.

District Court for the District of Utah—Central Division. Of course, if the amounts thus offset should exceed your liability to USI as finally determined, the balance will be paid to you with interest.

*Id.* at 1228.

**15.** Ordinarily a trustee cannot set off claims owed to it in its individual capacity against assets held in trust. *See Alvord v. Ryan,* 212 F. 83 (8th Cir.1914); *accord Garrison v. Edward Brown & Sons,* 25 Cal.2d 473, 154 P.2d 377 (1944); *Goodwillie v. City of Bayonne,* 2 N.J. 88, 65 A.2d 742 (1949); *Harris v. Elliott,* 24 A.D. 133, 48 N.Y.S. 1020 (1897).

304 A.2d 320, 331 (Del.Super.1973).[16] The acts relied upon must occur after the proceeding is filed. W. Prosser, *supra,* at 856; *Blue Goose Growers, Inc. v. Yuma Groves, Inc.,* 641 F.2d 695, 697 (9th Cir.1981) (applying Arizona law); *Weiss v. Hunna,* 312 F.2d 711, 717 (2d Cir.), *cert. denied,* 374 U.S. 853, 83 S.Ct. 1920, 10 L.Ed.2d 1073 (1963) (applying New York law). Gregg relies upon pre-suit actions by USI. Alleged misrepresentations by USI made in the Delaware suit do not provide the necessary willful act. W. Prosser, *supra,* at 856 n. 66.

## VIII. USI's claim for preemption of corporate opportunity

■ One of the claims severed for non-jury disposition was USI's counterclaim for Gregg's alleged preemption of corporate opportunity by purchasing Camp Concrete Rock Company. The court, applying Florida law (no party contends this choice is incorrect), held that once Gregg was removed as president and chief operating officer [17] of his former companies and made only a consultant he no longer had fiduciary duties of such nature that they would be breached by his purchase of Camp Concrete. Gregg had no specific fiduciary obligation concerning acquisitions; his new duties as consultant had no relation to acquisitions. We agree with the district court that, under Florida law, Gregg had no general fiduciary obligation to USI. *Connelly v. Special Road & Bridge District No. 5,* 99 Fla. 456, 126 So. 794, 798 (1930); *Renpak, Inc. v. Oppenheimer,* 104 So.2d 642, 644 (Fla.Dist. Ct.App.1958). Gregg had been removed from management against his will, his authority taken away, forbidden to communicate with employees or to maintain an office on company premises, and required to surrender possession of company property. He had no regular duties but was subject to being called upon by USI for narrow and specialized purposes (primarily to consult concerning outstanding claims against the Corps of Engineers).

## IX. USI's claim for breach of covenant not to compete

This was severed from the jury trial and dismissed post-trial on the merits because the covenant, contained in the Employment Agreement, was part of the indivisible contract that the court held illusory. This must be reversed. *See supra* Part IV, above.[18]

## X. The $500,000 note and its spinoffs

■ Before trial the court told the parties that USI's counterclaim on the note would be tried. However, at the conclusion of the evidence the court removed this counterclaim as an issue for the jury and reserved it for post-trial consideration. Post-trial the court granted judgment for USI on the note. This is due to be affirmed.

Gregg contends that, under his invocation of a fraud and duress defense to the note counterclaim, he was entitled to judgment as a matter of law once the jury found that USI committed fraud. We cannot accept this argument. Gregg did not seek recision of the transaction, including the note, but rather alleged fraud in the inducement and sought breach of contract damages. He could not affirm the contract and at the same time disaffirm it by asserting fraud and duress in diminution of his liability on the consideration that he gave. *See Ball v. Ball,* 160 Fla. 601, 36 So.2d 172, 177 (1948); *Storrs v. Storrs,* 130 Fla. 711, 178 So. 841,

---

**16.** Gregg asserts that Florida law governs but concedes that Florida uses the same test. *Blue v. Weinstein,* 381 So.2d 308, 310 (Fla.Dist.Ct. App.1980).

**17.** The court did not base its ruling on its conclusion that the indivisible agreement was illusory but rather, presumably assuming arguendo that the agreement was valid, held that Gregg's fiduciary obligations as president and chief operating officer terminated when he was removed. We find no error in this conclusion.

**18.** We have not reached USI's alternative argument that the covenant is enforceable as part of a separate document that the parties signed in June 1971.

843 (1937); *Hustad v. Edwin K. Williams & Co.—East,* 321 So.2d 601, 603 (Fla.Dist.Ct. App.1975), *cert. denied,* 333 So.2d 41 (Fla. 1976).

■ Gregg makes another argument that the court committed reversible error in its handling of issues arising out of the note. His argument seems to run this way. Because the court announced that the note counterclaim would be tried, he omitted presentation of evidence concerning the value of the note as an asset of the Gregg companies (which would have increased the value of assets that he gave up). Rather, he elected to defend the note counterclaim on grounds of fraud and duress.[19] And, when the court removed the counterclaim as an issue for the jury and reserved it for post-trial consideration, he lost his right to a jury trial on the fraud and duress defense. As we have already pointed out, Gregg was not entitled to a fraud and duress defense. He sued for fraud in the inducement, did not disaffirm the contract, retained the benefits, and sued for breach. He was free to present his case with the note included as an asset. Moreover, the premise for Gregg's argument is unfounded. His contentions were presented to the court post-trial, and it held that in fact the note had not been excluded from calculation of the Gregg assets. We have examined the testimony of Gregg and of the experts for both sides, the documentary evidence, and the arguments to the jury. There is adequate evidentiary basis for the jury to infer that the note was an asset of the Gregg companies and to use it as a factor in reaching its valuation.

■ The note contained a provision for attorney fees on default. The court denied fees to USI on the ground that both parties had prolonged the litigation unnecessarily and had made its resolution difficult, and that the legal services attributable to the note were minimal compared to the overall services by USI's attorneys. We decline to disturb this discretionary decision. *Cable Marine, Inc. v. M/V Trust Me II,* 632 F.2d 1344 (5th Cir.1980).

## XI. Improper jury argument

■ USI maintained that Gregg misrepresented the financial status of a contract Gregg had with the Corps of Engineers. At the time of trial USI had pending before the Army Corps of Engineers Board of Contract Appeals a claim for equitable adjustment of this contract. The court instructed both parties that jury argument about USI's prospects for recovering on this pending claim would be improper. USI maintains that it is entitled to a new trial on its fraud counterclaims because Gregg improperly argued to the jury that USI had favorable prospects for recovering on this claim. This contention was raised by motion for mistrial and motion for new trial, and the trial judge denied both. We have considered the arguments made by Gregg and those by USI to which Gregg was responding, and we find no error in the trial court's rulings.

## Conclusion

Summarizing, we hold:

### Gregg's claims

Count I: Common law fraud. Judgment that USI committed fraud AFFIRMED. Judgment for Gregg for $500,000 compensatory damages REVERSED. Judgment for Gregg for $500,000 punitive damages REMANDED.

Count II: Securities fraud. Judgment for USI AFFIRMED.

---

19. Brief of Gregg, No. 81–5956, at 10: "Because Gregg contended the note was valueless due to his defenses to its payment, counsel refrained from arguing [to the jury] that Gregg was entitled to [damages that included] the face value of the note."

Reply Brief of Gregg, No. 81–5956, at 9: "Gregg's counsel consistently maintained that the note was valueless because it was procured by duress and fraud and was therefore unenforceable."

Count III: Breach of contract. Judgment for USI AFFIRMED.

Count IIIA: Quantum meruit. Judgment for USI VACATED.

Count IV: Contract claim for unpaid dividends. Judgment for Gregg AFFIRMED.

Count V: Conversion of dividends. Judgment for USI REVERSED.

Count VI: Interference with Gregg's business relations with bank. Judgment for USI REVERSED.

Count VII: Abuse of process by USI. Judgment for USI AFFIRMED.

*USI's counterclaims*

First: Common law fraud. Judgment for Gregg AFFIRMED.

Second: Securities fraud (1933 Act). Judgment for Gregg AFFIRMED.

Third: Securities fraud (1934 Act). Judgment for Gregg AFFIRMED.

Fourth: Breach of contract. Judgment for Gregg REVERSED.

Fourth-A: Breach of warranty. Judgment for Gregg VACATED.

Fifth: Recision. Judgment for Gregg VACATED.

Sixth: Breach of fiduciary duty and mismanagement. Judgment for Gregg VACATED.

Seventh: Breach of covenant not to compete. Judgment for Gregg REVERSED.

Eighth: Preemption of corporate opportunity. Judgment for Gregg AFFIRMED.

Ninth: On note. Judgment for USI AFFIRMED. Judgment denying attorney's fees AFFIRMED.

Tenth: Quantum meruit. Judgment for Gregg VACATED.

Eleventh: Procurement of watered stock. Judgment for Gregg VACATED.

AFFIRMED in part, VACATED in part, REVERSED in part, and REMANDED. Each party shall bear its own costs.