**In re CAPTRAN CREDITORS TRUST, Debtor.**

**CAPTRAN CREDITORS TRUST, Plaintiff,**

v.

**NORTH AMERICAN TITLE INSURANCE AGENCY, INC., a Florida corporation, George Mills, Joan Smock, Captran Resorts International, Inc., a Florida corporation, Keith Trowbridge, Jeffrey W. Warren, Bush, Ross, Gardner, Warren & Rudy, P.A., a Florida Professional corporation, and Mortgage Managers, Inc., a Florida corporation, Defendants.**

**Bankruptcy No. 85–0045–8P1. Adv. No. 88–460.**

United States Bankruptcy Court, M.D. Florida, Tampa Division.

June 29, 1990.

See also, Bkrtcy., 104 B.R. 442.

Richard Epstein, Greenspoon & Marder, P.A., Fort Lauderdale, Fla.

Jeff Warren & Bush Ross c/o Charles Ketchy, Tampa, Fla.

Thomas Hayes, Fort Myers, Fla.

Jeffrey W. Warren, Tampa, Fla.

## FINDINGS OF FACT, CONCLUSIONS OF LAW AND MEMORANDUM OPINION

ALEXANDER L. PASKAY, Chief Judge.

THIS is the second major litigation in this confirmed Chapter 11 case, and the matters currently under consideration are the claims set forth in a seven-count Amended Complaint filed by Captran Creditors Trust (CCT). The Complaint was originally filed against North American Title Insurance Agency, Inc. (NATIA), George Mills (Mills), Joan Smock (Smock), Captran Resorts International, Inc. (CRI), Keith Trowbridge (Trowbridge), Canadian Imperial Bank of Commerce (CIBC), Jeffrey W. Warren (Warren), the law firm of Bush, Ross, Gardner, Warren & Rudy, P.A. (Bush, Ross), and Mortgage Managers, Inc. (Mortgage Managers). A few months before trial, CIBC was dismissed as a defendant, and immediately before trial, Mills and Smock were also dismissed by CCT voluntarily.

The Court, having heard extensive testimony of witnesses at the final evidentiary hearing, and having considered the docu-mentary evidence, together with the record and the post-trial submissions of counsel, now finds and concludes as follows:

### Events Leading up to First Chapter 11 Case

In 1982, Captran Resorts International, Inc. (CRI), a Florida corporation based in Lee County, Florida, was engaged in the business of developing resorts in Southern Florida and selling timeshare interests in the developed or yet to be developed resorts to the public. At about the same time, CRI, through its president, Trowbridge, also entered into a joint venture agreement with Club Baha, Inc. and Tropical Properties, both entities controlled by Jack Grabowski (Grabowski), for the development of similar enterprises in the Bahamas. A disagreement between the parties ultimately resulted in litigation which concluded with a $1.7 million Final Judgment against CRI and Trowbridge and in favor of Club Baha and Tropical Properties. (Plaintiff's Exh. No. 1.)

CRI, not having been able to satisfy the judgment and faced with the possibility of losing some, if not all, of its property because it could not post a supersedeas bond, filed a Voluntary Petition for Relief under Chapter 11 of the Bankruptcy Code in this Court on July 16, 1982. Soon after CRI filed its bankruptcy petition, CRI and some of its creditors, primarily Grabowski, on behalf of Club Baha and Tropical Properties, entered into extensive negotiations with CRI. The purpose of their negotiations was to devise a plan to satisfy CRI's creditors and to resolve all CRI's problems outside of the provisions of Chapter 11 of the Bankruptcy Code. These creditors, in addition to Club Baha and Tropical Properties, were the consumers who purchased timeshare interests from CRI, but did not receive the benefit of their bargain.

The negotiations ultimately produced an agreement which provided that certain, but not all, creditors of CRI would form a trust, Captran Creditors Trust (CCT). The assets of CRI, with some minor exceptions, were to be transferred to CCT to be the trust res, and the creditors of CRI were to

be the trust beneficiaries. David McConnell, an attorney, and Gerard McHale, a certified public accountant, were appointed as the initial trustees for this newly created trust. A copy of the Agreement, a synopsis of its salient provisions and copies of related documents are included in what is referred to as "the yellow book." (Plaintiff's Exh. No. 1.) The Agreement was finalized in December, 1982. Based on this Agreement, this Court entered an Order which granted CRI's Motion to Dismiss its Chapter 11 case, and the first Chapter 11 case was dismissed on December 6, 1982.

The Agreement provided, inter alia, that CCT would receive from CRI certain specified assets of CRI; that CCT would assume all debts and liabilities associated with all the assets to be transferred into the trust. The assets transferred to CCT would be marketed and sold by the trustees, and the sale proceeds would go to the trust to be distributed to the beneficiaries of the trust. Under the Agreement, CRI was to act as the marketing agent for the trust properties and was to receive 38% of the sale price of the properties for its marketing services. Additionally, any residual interest remaining after full satisfaction of the interests of the beneficiaries was to be revested in CRI.

CRI did, in fact, act as the marketing agent for the trust properties. All of the sales of the trust properties were through a real estate firm owned and controlled by Trowbridge, and they were processed through NATIA, a title company managed by Smock and owned and controlled by Trowbridge. Smock was originally named by CCT as a defendant, but she was dismissed immediately before trial.

Both the trustees and Grabowski attempted to sell all of the trust assets in bulk; however, they were unable to find a buyer. (Defendant's Exhs. No. 51, No. 52.) To solve their dilemma, the trustees developed a liquidation plan pursuant to which the trust assets would be distributed in-kind to the trust beneficiaries in exchange for the beneficiaries relinquishing their interest in the trust. (Plaintiff's Exh. No. 66.) However, CRI resisted the in-kind distribution and threatened to sue the trustees if they proceeded with this plan. (Defendants' Exh. No. 6.) CRI's resistance is understandable in light of a provision in the Agreement, noted earlier, which preserved for CRI any residual interest in the trust properties which remained after the liquidation of the trust assets and after the satisfaction of the trust beneficiaries' interest.

In order to protect their position, the trustees filed a suit for declaratory relief requesting that the Circuit Court of Lee County, Florida approve the in-kind distribution. The trustees also sought a temporary restraining order and sought to remove CRI as the marketing agent for the trust assets. The request was denied. (Defendants' Exhs. No. 44 and No. 47.) Although the Agreement clearly contemplated the in-kind distribution, it was never consummated.

During the pendency of the declaratory suit in the Circuit Court of Lee County, several of the trust beneficiaries assigned their interest in the trust to Club Baha. As a result, Club Baha had become the holder of over 90% of the beneficial interests in the trust. Shortly thereafter, Grabowski, acting on behalf of Club Baha and Tropical Properties, discharged McHale and McConnell, relieved them from their duties as trustees, and appointed Michael Glantz and Sylvia Steeves as successor trustees. (Plaintiff's Exh. No. 44.)

The successor trustees and Club Baha then entered into an agreement pursuant to which the successor trustees, at the direction of Grabowski, agreed to convey the bulk of the trust assets to Club Baha in exchange for Club Baha's interest in the trust. However, before this transfer could be finalized, NATIA, Mills, and Smock, claiming to be creditors of CCT, filed an involuntary Petition against CCT in this Court in order to prevent the transfer of the trust properties to Club Baha. After extensive pretrial litigation, CCT consented to the entry of the order for relief on the eve of the final evidentiary hearing. This order expressly reserved jurisdiction to determine whether sanctions could be award-

ed to CCT based on Section 303(i) of the Bankruptcy Code.

### The Second Chapter 11

The events leading up to the commencement of this Chapter 11 case by the involuntary petition filed by the Defendants NATIA, Mills, and Smock form the basis of several of the claims asserted against the remaining Defendants by CCT and are as follows:

The Defendant Warren is a practicing attorney and is a partner in a Tampa law firm, Bush, Ross, also named as a defendant in this adversary proceeding. Sometime in 1983, Warren was contacted by CIBC for the purpose of discussing the possibility of representing CIBC's interest. It appears that CIBC financed a timeshare development project known as Falcon Lakes Resort located in the Canadian Province of Manitoba. The obligations of this project were represented by three promissory notes executed by an entity and guaranteed by CRI. The project failed and was placed in receivership, and ultimately liquidated. CIBC was unable to recover anything from the prime obligor on the promissory notes guaranteed by CRI.

CIBC provided Warren with the documentation of its claims. However, before Warren was able to file a proof of claim in CRI's Chapter 11 case, the case was dismissed. Warren unsuccessfully sought to reopen the case and sought to set aside the order which authorized the conveyance of CRI's assets to CCT. Thereafter, Warren filed a suit against CRI in the Circuit Court of Lee County based on CRI's guaranty.

At this point, Warren was faced with the possibility that the lawsuit against CRI might not be worth pursuing since the creation of the trust left CRI with hardly any assets at all. Thus, even if Warren was ultimately successful in obtaining a judgment against CRI on the guaranty, it appeared to be unlikely that Warren could ever obtain satisfaction of the judgment on behalf of CIBC.

After the formation of CCT, Warren had some contact with the original trustees of CCT and obtained a copy of the "yellow book" mentioned earlier. The yellow book revealed that CIBC was not listed as one of the trust beneficiaries. Warren informed the original trustees that he was representing CIBC, and he insisted that CIBC be included as a trust beneficiary. Notwithstanding Warren's request, CIBC was never recognized as a trust beneficiary.

At some point, Warren became aware of the lawsuit filed in Lee County Circuit Court by the original trustees, McHale and McConnell, in which they sought declaratory relief regarding their right to make an in-kind distribution of the trust assets to the trust beneficiaries. In October 1984, Warren filed a Motion to Intervene in that lawsuit. The Motion was heard in Circuit Court in Fort Myers on January 7, 1985. In the interim, Warren learned that McHale and McConnell were discharged by Mr. Grabowski, and they were replaced by Michael Glantz and Sylvia Steeves as successor trustees for CCT.

After the hearing on the Motion to Intervene, Warren met in Fort Myers with Greg White, an attorney representing CRI, and Diane Jensen, White's law partner, and Trowbridge, the principal of CRI and NATIA. Warren learned earlier that Glantz and Steeves were already in the process of transferring trust assets to Club Baha.

Faced with the real probability that Grabowski would remove all trust assets from the trust, Warren, White, Jensen and Trowbridge discussed several alternatives available to ensure that no trust properties would be transferred to Club Baha. One of the alternatives discussed was the possibility of filing an involuntary bankruptcy petition against CCT.

White and Jensen took the position that CCT was not eligible to be a debtor under the Bankruptcy Code; but Warren, after extensive legal research, concluded that CCT was, in fact, a business trust within the definition of the term "corporation" under § 101(8)(A)(v) of the Bankruptcy Code therefore, CCT was eligible to be a debtor.

Of course, it was evident that Warren could not pursue this course of action on

behalf of CIBC, the only entity he represented, for the obvious reason that CIBC never had a claim against CCT and therefore was not eligible to participate as a petitioning creditor in an involuntary petition to be filed against CCT. This fact led to the strange alliance of a judgment creditor, CIBC, and its judgment Debtor, CRI, strange bedfellows indeed, who joined forces in order to pursue the course of action decided upon, i.e. to stop the transfer of trust properties to Club Baha by filing an involuntary petition against CCT.

Since CIBC could not be a petitioning creditor, it was up to Trowbridge, president of CRI and NATIA, to get three creditors who would be willing to initiate an involuntary petition against CRI. Trowbridge had no difficulty in giving Warren the names of Mills, the former controller of CRI, Smock, the manager of NATIA, and NATIA, the title company owned and controlled by Trowbridge who were to act as petitioning creditors.

Neither Mills nor Smock ever had any contact with Warren up to this point. It is unclear from the record whether Warren spoke with Mills on the phone before the involuntary Petition was filed. However, whether he did or not, it is really of no consequence for the simple reason that Warren never requested and received any documentation of Mills' claim. Even assuming that Warren spoke with Mills on the phone regarding his claim against CCT, it is clear that Warren never spoke to Smock regarding her claim prior to filing the involuntary petition. The most that could be said is that he spoke to Mills regarding Smock's claim. Certainly, Warren had no right to rely on Mills' statements regarding Smock's claims against CCT, and his reliance on Mills' statements was equally unjustified.

It is clear that neither Mills nor Smock ever formally retained Warren as their attorney before the involuntary Petition was filed. It was only after the commencement of the involuntary case that Mills and Smock accepted Warren as an attorney. There is hardly any doubt that at all times, Warren represented the interest of CIBC

and he was paid by CIBC for his services. Warren never sought or received any payment from Mills, Smock, or NATIA for his services in connection with the involuntary case.

The alleged claim of NATIA in the amount of $1,500, was based on escrow fees claimed to be owed by CCT; however, unbeknownst to Warren, this bill had already been paid prior to the filing of the involuntary petition. The other two creditors, Mills and Smock, claimed to have claims against CCT in the amount of $3,944 and $800, respectively, based on services allegedly performed by them for the trust. It is without dispute that neither Mills nor Smock were ever employed by CCT or authorized by the Trustees to perform services on behalf of CCT.

The involuntary Petition for Relief was filed by Warren the day after the meeting with White, Jensen and Trowbridge in Fort Myers. It soon became apparent that NATIA was not a bona fide creditor because its claim had been paid earlier. To fill the gap, CRI joined as a petitioning creditor, asserting that it had a claim against CCT in the amount of $59,248. It is notable that CCT objected to the claims of Mills, Smock, and CRI, and ultimately, the objections were upheld by this Court and all these claims were disallowed.

As noted earlier, an Order of Relief was entered by this Court with the consent of CCT after almost two years of pre-trial litigation. A Plan of Reorganization proposed by Club Baha and Grabowski, which was a total liquidation plan, was ultimately confirmed by this Court. This Plan of Reorganization basically produced the same result that had originally been contemplated by Club Baha, the in-kind distribution of the trust assets, the same plan the original trustees, McHale and McConnell, had attempted to implement.

### Background of this Litigation

Based on the foregoing facts, CCT filed a seven-count Complaint against the Defendants. The claim in Count III for punitive damages and the claim in Count IV for malicious prosecution were dismissed earli-

er by Order of this Court. Consideration of the claim in Count VII, which seeks damages pursuant to Chapter 727 of the Florida Statutes, the Florida RICO Statute, was deferred by this Court pending the outcome of this litigation. This leaves for consideration claims of CCT set forth in Counts I, II, V, and VI.

CCT's claim in Count I is based on the contention that Mills, Smock and NATIA filed the involuntary petition against CCT in bad faith thus, pursuant to § 303(i)(1), (2)(A) of the Bankruptcy Code CCT is entitled to recover damages proportionately caused by the filing. In support of this proposition, CCT contends that on the date of the filing of the Involuntary Petition, neither NATIA, Mills, nor Smock were creditors of CCT, and when CRI joined in later, CRI was likewise not a creditor of CCT. CCT contends that the Defendants' bad faith filing renders the petitioning creditors liable for damages, as well as punitive damages. According to CCT, these damages specifically include diminution in the value of CCT's assets, costs associated with the inability to carry on its business in the ordinary course, fees for attorneys and other professionals and court costs.

The claim in Count II is based on an alleged civil conspiracy to cause a bad faith filing and seeks damages against Defendants NATIA, Mills, Smock, CRI, Trowbridge, CIBC, Warren, and the law firm of Bush, Ross. In support of this proposition, CCT contends that Defendants NATIA, Mills, Smock, and CRI permitted themselves to be designated as petitioning creditors in the Involuntary Petition against CCT, notwithstanding the fact that their claims had no legal or factual support. CCT further contends that Defendants Warren and Bush Ross conspired and "aided and abetted" the other Defendants in perpetuating this scheme. CCT contends that Trowbridge and CIBC also conspired to pursue the bad faith filing of the Involuntary Petition against CCT (sic).

In Count V, CCT seeks damages from all of the Defendants based on their alleged abuse of process. In this Count, CCT alleges that all of the Defendants knew that the claims asserted against CCT by Defendants NATIA, Mills, Smock and CRI were invalid and without merit. Additionally, CCT contends that the Defendants used the process of this Court to financially harm CCT. CCT further contends that there was never a just, lawful, or factually supportable purpose for the issuance of process in the involuntary bankruptcy case, and that this Court was used by the Defendants to advance their own illegitimate purposes.

In Count VI, the Plaintiff seeks damages for the Defendants' alleged tortious interference with the Plaintiff's contract rights. In this Count, which was filed against all of the Defendants, the Plaintiff contends that the Defendants used the involuntary bankruptcy proceeding to interfere with the Plaintiff's contractual undertakings.

■ It was determined at the final evidentiary hearing that since Mills, Smock and CRI were dismissed as defendants, the claim in Count I remains only against NATIA. NATIA was not a creditor of CCT when it permitted itself to be designated as a petitioning creditor for the involuntary Petition against CCT. Thus, clearly it has no business to participate as a petitioning creditor. However, this Court is equally satisfied that NATIA cannot be held liable for all of the damages sought by CCT in this count for several reasons. There is nothing in this record to sustain a finding that NATIA is responsible for all subsequent litigation which ensued before the Order for Relief was entered by this Court. In addition, there is nothing in this record to warrant the finding that NATIA's participation as a petitioning creditor caused any damages to CCT.

A review of the docket sheet shows that after the involuntary Petition was filed, the bulk of the litigation was mainly the result of motions filed by CCT resisting the entry of the Order for Relief, the very Order to which CCT later consented. This is not surprising in light of the undisputed fact that CCT had no ongoing business at the time the involuntary petition was filed; the only task CCT had to accomplish, according to Grabowski, was to complete the transfer

of trust assets to Club Baha. This is the exact result which was accomplished by the Reorganization Plan filed by Grabowski on behalf of Club Baha. Therefore, this Court is satisfied that it is not appropriate to hold NATIA liable for the costs CCT incurred in resisting the entry of the Order for Relief and certainly not for costs incurred by CCT after the Order for Relief.

Equally, there is no proof in the record that the damages incurred by CCT were the proximate result of CRI's joinder in the involuntary Petition. In fact, all of the professionals, whose fees CCT seeks to recover as part of its damages, were employed *after* this Court entered the Order for Relief. Certainly CRI cannot be forced to bear the costs and fees incurred by CCT in its Chapter 11 case after CCT consented to the entry of the Order for Relief.

In sum, while it might be said that NATIA and CRI may be guilty of bad faith filing this Court is satisfied that CCT failed to prove that the costs it incurred because of the involuntary Petition were due to the conduct of NATIA and CRI, and, therefore, the claim for damages under Count I against them cannot be sustained.

The claim in Count II is based on an alleged civil conspiracy by the defendants to cause bad faith filing. This claim is asserted against CRI, NATIA, Trowbridge, Warren, and Bush, Ross.

■ Civil conspiracy is an agreement between two or more persons acting in concert to accomplish an unlawful purpose or to accomplish some purpose, not in itself unlawful, but by unlawful means. *Renpak, Inc. v. Oppenheimer*, 104 So.2d 642 (Fla. 2d DCA 1958). There is no doubt that at least Warren and Trowbridge, acting on behalf of CRI and NATIA, agreed to initiate an involuntary case against CCT. This Court is satisfied that it is appropriate to consider the conspiracy count only with regard to Warren and Trowbridge because it was they who met and acted in concert.

Warren and Trowbridge admit that the purpose of initiating the bankruptcy case was to prevent Grabowski, through the successor Trustees, Glantz and Steeves, from transferring all of the trust proper-

ties to Club Baha. They both agreed that the only way to prevent the transfer of all of the trust assets to Club Baha was to file an involuntary bankruptcy petition against CCT.

The means chosen by Warren and Trowbridge to accomplish this were not improper per se since the initiation of an involuntary case is an integral part of the relief available under the Bankruptcy Code and under proper circumstances it is perfectly legitimate to use Section 303 of the Bankruptcy Code to prevent transfer of properties of a Debtor who is generally not paying its debts as such debts become due. However, to use the relief provided for by § 303 of the Bankruptcy Code, knowingly using the names of petitioning creditors who do not have a claim against the Debtor is a horse of a different color and is certainly not a proper tool to achieve a goal which might otherwise be legitimate.

In this particular instance, there is hardly any doubt that Warren had no personal knowledge that either Mills, Smock or NATIA had a valid claim against CCT. It is equally clear that Warren was less than prudent when he accepted Trowbridge's representation that NATIA, Mills and Smock had valid claims against CCT. Warren without doubt disregarded even the most elementary duties of an attorney, by holding himself out as an attorney for the alleged creditors, whom he had never met or been retained by to file the involuntary Petition on their behalf. In addition, even assuming that he was entitled to accept the representation made by Trowbridge on behalf of NATIA, since he was the principal of NATIA, he was certainly not justified in accepting at face value the representation by Trowbridge made on behalf of Mills and Smock. Warren clearly failed to conduct even a modicum of reasonable inquiry concerning the facts surrounding the claims of Mills, Smock and NATIA set forth in the involuntary Petition which he signed as attorney for the petitioning creditors. Be that as it may, in the absence of competent proof of scienter, the actions of Warren, while less than acceptable, fall short of those which would justify the conclusion

that the means employed by him were improper. This leaves for consideration the goals sought to be achieved by Warren and Trowbridge through the filing of the involuntary petition.

There is no doubt that Warren and Trowbridge sought to achieve their own distinctive and separate goals. Trowbridge sought to prevent Grabowski from transferring all of the assets of CCT to Club Baha because that transfer would have destroyed the contractual right to the residual interest of the trust properties, as well as the interest of some creditors of CCT who were not designated to be recipients of the in-kind distribution contemplated by Grabowski. Thus, in light of the foregoing, the goal sought to be achieved by Trowbridge was legitimate and proper.

The legitimacy of Warren's goal, at first blush, is less clear. Warren's main goal was to protect the interest of CIBC, which had a claim only against CRI, and not against CCT. CIBC was not a beneficiary of CCT and had no direct claim against CCT. Thus, it can be argued that because CIBC was not a trust beneficiary and had no direct interest in the trust properties, the goal Warren sought to achieve was improper. However, it can also be argued that CIBC had a legitimate indirect interest in the trust properties of CCT, in that CIBC had a potential claim against the residual interest of CRI that would revert back to CRI after the trust beneficiaries were satisfied. Thus, if the transfer of the trust properties to Club Baha was accomplished, CIBC's chance to recover its judgment against CRI would be destroyed. Based on the foregoing, in this sense Warren's goal was also legitimate.

In sum, this Court is satisfied that both the means employed and the goals sought to be achieved by Warren and Trowbridge were lawful and proper, and, therefore, the claim for civil conspiracy cannot be sustained and the claim set forth in Count II of the Plaintiff's Complaint against Warren, Trowbridge and the remaining Defendants cannot stand and should be dismissed.

The claim in Count V is based on abuse of process asserted against CRI, NATIA, Trowbridge, Warren, and Bush, Ross. Abuse of process requires use of legal process against another, primarily to accomplish a purpose for which it was not designed. *Bothmann v. Harrington*, 458 So.2d 1163 (Fla. 3d DCA 1984). Abuse of process does not deal with the issuance of process; instead, it deals with the use of process after its issuance for an improper purpose. *Gregg v. U.S. Industries, Inc.*, 715 F.2d 1522 (11th Cir.1983), *modified*, 721 F.2d 345 (11th Cir.1983), *cert. den.*, 466 U.S. 960, 104 S.Ct. 2173, 80 L.Ed.2d 556 (1984). A willful misuse of process for an unlawful objective or collateral purpose constitutes abuse of process. However, where legal process is used to accomplish its designed purpose, there is no abuse of process. *Miami Herald Publishing Co. v. Ferre*, 636 F.Supp. 970 (S.D.Fla.1985); *Bothmann, supra*, at 1269.

Three elements must be present in order to prevail on an abuse of process claim. First, it must be shown that the defendant made an illegal, improper, perverted use of the process which was neither warranted nor authorized by the process. Second, it must be shown that the defendant had an ulterior motive or purpose in exercising the illegal, perverted, or improper use of process. Finally, the plaintiff must prove that damages were incurred because of the irregularity. *1 Am. Jur.2d Abuse of Process, § 4.*

It is clear that Warren and the petitioning creditors used the process issued by the Clerk upon filing the petition in order to process CCT's bankruptcy case. Proceeding in this manner was both warranted and authorized by the Bankruptcy Code and by Bankruptcy Rule 1010. In sum, it cannot be said that any of the Defendants named in this Count used the process issued by the Clerk to achieve illegal, perverted or improper goals. Therefore, the claim in Count V of the Plaintiff's complaint cannot be sustained and should be dismissed.

The claim in Count VI is based on an alleged tortious interference with

contractual rights. It is asserted only against CRI and Trowbridge. The gravamen of this claim is based on the contention that CRI and Trowbridge filed a lis pendens in the public records of Lee County which, in turn, prevented the trustees from conveying clear title of the trust properties to Club Baha. The elements of tortious interference with contract include: the existence of an advantageous business relationship under which the Plaintiff has legal rights; an intentional and unjustified interference with that relationship by the Defendant, and damage to the Plaintiff as a result of the breach of the business relationship. *Insurance Field Services, Inc. v. White & White Inspection and Audit Service, Inc.*, 384 So.2d 303 (Fla. 5th DCA 1980). CCT had no business relationship based on a contract with Club Baha or Tropical Properties, let alone an advantageous business relationship. Actions which are designed to protect or promote one's own financial and contractual interests are not actionable. *Ethyl Corp. v. Balter*, 386 So.2d 1220 (Fla. 3rd DCA 1980). *Heavener, Ogier Services v. R.W. Fla. Region*, 418 So.2d 1074 (Fla. 5th DCA 1982). This Court is satisfied that the claim for tortious interference with contract rights against Trowbridge or CRI should be dismissed.

The transaction which was allegedly frustrated by CRI and Trowbridge was intended to divest the trust of all of the trust assets. If this transaction was not stopped, it would have stripped CCT of all of its assets without vesting anything in either the other beneficiaries who were not part of the in-kind distribution or other bona fide creditors of CCT. This record leaves no doubt that CRI and Trowbridge had a legitimate interest which they were entitled to protect.

Count VII of the Plaintiff's Complaint, which is based on an alleged violation of Florida Statute § 895 (Fla. RICO) was not tried by this Court. The claim in this Count which was asserted only against NATIA and Mortgage Managers, is based on the allegation that NATIA and Mortgage Managers engaged in a pattern of criminal activity involving the escrow accounts

maintained by NATIA and the administration of timeshare mortgages. A final evidentiary hearing on Count VII shall be scheduled before the undersigned in Courtroom A of the United States Bankruptcy Court, 4921 Memorial Highway, Tampa, Florida, on August 31, 1990, at 1:30 p.m.

A separate Final Judgment will be entered in accordance with the foregoing.